504 S.E.2d 592

**Ex Parte The STATE RECORD CO., INC., Appellant,**

v.

**In Re STATE of South Carolina vs.**
**B.J. Quattlebaum, Respondent.**

**No. 24831.**

Supreme Court of South Carolina.

Heard Oct. 22, 1997.
Decided Aug. 31, 1998.
Rehearing Denied Sept. 25, 1998.

Jay Bender and Kirby D. Shealy, III, of Baker, Barwick, Ravenel & Bender, Columbia, for appellant.

Joseph M. McCulloch, Jr., Columbia, A. Camden Lewis of Lewis, Babcock & Hawkins, Columbia; Katharine E. Evatt and Donald V. Myers, Lexington, for respondent.

WALLER, Justice:

This is an appeal of a temporary restraining order prohibiting the media from disseminating the contents of a videotape containing a privileged communication between the defendant herein, B.J. Quattlebaum, and his attorney. The State–Record Co., Inc. (The State/Newspaper) appeals. We affirm.

## FACTS

Quattlebaum was indicted for murder, armed robbery, assault and battery with intent to kill and possession of a

firearm during commission of a violent crime; the State sought the death penalty. While he was imprisoned at the Lexington County Detention Center, a privileged conversation between Quattlebaum and his attorney was surreptitiously recorded.[1] The videotape was thereafter disseminated to WIS–TV, a Columbia television station.[2] Upon learning of the videotape and its dissemination to the media, Quattlebaum moved for a temporary restraining order (TRO) prohibiting dissemination or characterization of its audio content. On August 18, 1997, the circuit court granted an *ex parte* TRO, pending a hearing the following day, prohibiting all trial participants and all media from disseminating the substance and details of the privileged communication. Counsel for The State was notified by telephone and a copy of the order was served on it the same day.

After a hearing on August 19, 1997,[3] the circuit court continued its order in effect until such time as a jury was empaneled and sequestered in Quattlebaum's case.[4] The circuit court's order specifically notes that it does not "prohibit the reporting of the invasion of the attorney client privilege;" nor does it "restrain or prohibit [publication of] the identity of the individuals involved or the nature of the charges in the case." It simply prohibits the "dissemination of the contents of the communication or the characterization of its contents."

## ISSUES

1. Did the circuit court have subject matter jurisdiction to issue the temporary restraining order?

---

1. It is undisputed that the conversation is in fact a privileged, attorney-client communication.

2. The manner of its distribution is unknown and is not an issue on appeal.

3. The State attended the hearing.

4. The order on appeal has effectively expired since Quattlebaum was tried, convicted and sentenced to death while this appeal was pending. However, the fact that Quattlebaum has now been tried does not render our decision moot. *See Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (court's jurisdiction is not defeated simply because the order attacked has expired, if the underlying dispute between the parties is one capable of repetition, yet evading review).

2. Did the circuit court have personal jurisdiction over Newspaper?

3. Did the court err in imposing a prior restraint?

## 1. SUBJECT MATTER JURISDICTION

Initially, The State contends the court of general sessions is without subject matter jurisdiction to issue an injunction.[5] We disagree.

The general rule that a court in a criminal case will not issue an injunction is subject to the exception that a court, once having obtained jurisdiction of a cause of action, has inherent power to do all things reasonably necessary to the administration of justice in the case before it. 42 Am.Jur.2d *Injunctions* § 11 (1969). The United States Supreme Court has recently recognized the inherent authority of a court to protect its proceedings. *See Degen v. United States*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) (courts invested with judicial power have inherent authority to protect their proceedings in course of discharging their traditional responsibilities). We find it patent that a court of general sessions has subject matter jurisdiction to issue an injunction, if necessary, to protect its proceedings.

## 2. PERSONAL JURISDICTION

The State next argues the circuit court was without personal jurisdiction to bind it. We disagree.

Under Rule 65(d) of the South Carolina Rules of Civil Procedure (SCRCP), every order granting a restraining order is binding on the parties and "those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." [6] Here, the only known media entity in possession of the videotape at the time

---

5. The State premises this contention upon the holding of *State v. Franks*, 214 S.C. 525, 53 S.E.2d 608 (1949). *Franks* relied on Section 565, Code of 1942, later codified at S.C.Code Ann. § 15–55–10, which was repealed upon enactment of the South Carolina Rules of Civil Procedure (SCRCP) (in effect at the time of this action). Accordingly, *Franks* and section 15–55–10 are inapplicable.

6. Under Rule 65(b), a temporary restraining order, as was initially issued in this case, may be issued without notice.

Quattlebaum sought a TRO was WIS–TV, which was named and served with the motion for a TRO. We agree with the circuit court that The State was "in active concert" with WIS and had actual notice of the order so as to be bound by it. We find no error in the circuit court's assertion of personal jurisdiction over The State.

## 3. PRIOR RESTRAINT[7]

The State next contends the circuit court erred in issuing a prior restraint as Quattlebaum failed to meet his burden of justifying its necessity. We disagree. Under the extremely limited factual circumstances of this case, we find the circuit court properly enjoined dissemination of the privileged communication between Quattlebaum and his attorney.

This Court is faced with a profound dilemma: whether to uphold a prior restraint upon the media's First Amendment[8] right of free speech, a task which carries with it an extremely heavy burden upon the party seeking to limit the speech[9]; or whether to invalidate the prior restraint placing in jeopardy the fundamental right of a defendant to a fair trial pursuant to the Sixth Amendment.[10] We are faced with the added quandary that the information sought to be disseminated by the media is a privileged communication between a criminal defendant and his attorney.[11]

---

7. Some courts draw a distinction between a "gag order" restricting merely trial participants, which is not characterized as a prior restraint, and one directly restraining the media itself. *See, e.g., United States v. Davis*, 904 F.Supp. 564 (E.D.La.1995); *Application of Dow Jones & Co.*, 842 F.2d 603, 609 (2d Cir.), *cert. denied*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988). The order on appeal directly enjoins the media. Accordingly, it is clearly properly characterized as a prior restraint.

8. U.S. CONST. amend. I; S.C. CONST. art. I, § 2.

9. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 556–59, 96 S.Ct. 2791, 2801–03, 49 L.Ed.2d 683, 695–98 (1976); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (setting forth presumption of unconstitutionality of prior restraints).

10. U.S. CONST. amend. VI; S.C. CONST. art. I, § 14.

11. We note, at the outset, that there is very little precedent regarding a balancing of the competing interests in this regard. Only one case,

To date, the United States Supreme Court has declined to assign priorities between the First Amendment right of free press and the Sixth Amendment right to a fair trial.[12] In *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 561, 96 S.Ct.

*United States v. Noriega,* has involved violation of the attorney client privilege. There have been a series of opinions in *Noriega.* The first was issued by the United States District Court for the Southern District of Florida. *United States v. Noriega,* 752 F.Supp. 1032 (S.D.Fla.1990) (*Noriega 1* ). In *Noriega 1,* the district court temporarily enjoined Cable News Network (CNN) from broadcasting tape recordings of privileged telephone conversations between Manuel Noriega and his defense team, until such time as the tape recordings could be reviewed by a federal magistrate to ascertain whether the defendant's right to a fair trial would be jeopardized by publication of the contents. The Eleventh Circuit affirmed the grant of the temporary injunction on the ground that CNN's failure to produce the tape recording had prevented the district court from balancing the defendant's right to a fair trial with CNN's First Amendment rights. *United States v. Noriega,* 917 F.2d 1543 (11th Cir.1990) (*Noriega 2* ). The United States Supreme Court denied certiorari. *Cable News Network, Inc. v.. Noriega,* 498 U.S. 976, 111 S.Ct. 451, 112 L.Ed.2d 432 (1990). Thereafter, the district court held Noriega had not met his burden of demonstrating the necessity of a permanent injunction, in part because a portion of the privileged attorney-client conversation had already been broadcast by CNN (such that it was moot), and that the remaining portion of the privileged conversation was simply not so prejudicial as to warrant a prior restraint. *United States v. Noriega,* 752 F.Supp. 1045 (S.D.Fla.1990) (*Noriega 3* ). The court in *Noriega 3* also found Noriega's claim that his Sixth Amendment right to effective assistance of counsel was jeopardized insufficient to justify the continued prior restraint, since alternative measures were available through which to prevent prosecutorial tainting. *Id.*

12. Although the Supreme Court has declined to do so, a number of lower courts have held that a defendant's Sixth Amendment right to a fair trial is superior to the right of free speech and that, where the two rights collide, the latter must give way to the former. *Application of Dow Jones & Co.,* 842 F.2d 603 (2d Cir.), *cert. denied,* 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988) (when exercise of free press rights actually tramples on Sixth Amendment rights, former must yield to the latter); *United States v. Davis,* 904 F.Supp. 564 (E.D.La.1995); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *News–Journal Corp. v. Foxman,* 939 F.2d 1499 (11th Cir.1991) (when First Amendment claims impinge on Sixth Amendment right to trial by impartial jury, asserted First Amendment freedoms must yield to the 'most fundamental of all freedoms,' the right to a fair trial for the accused); *Mockaitis v. Harcleroad,* 938 F.Supp. 1516 (D.Or.1996), *rev'd on other grounds,* 104 F.3d 1522 (9th Cir.1997).

2791, 2803–04, 49 L.Ed.2d 683, 699 (1976), the Court specifically declined to rule on the issue, stating:

> The authors of the Bill of Rights did not undertake to assign priorities as between the First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, petitioners would have us declare the right of an accused subordinate to their right to publish in all circumstances.... [I]t is not for us to rewrite the Constitution by undertaking what they declined to do. It is unnecessary, after nearly two centuries, to establish a priority applicable in all circumstances.

Notwithstanding its reluctance to assign priorities between the competing interests, the Court has recognized that the right of a defendant to a fair trial is "the most fundamental of all freedoms—[which] must be maintained at all costs." *Estes v. State of Texas,* 381 U.S. 532, 540, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543, 549 (1965). More recently, the Court noted that "No right ranks higher than the right of an accused to a fair trial." *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629, 637 (1984).

The *Nebraska Press* Court recognized a trial court's duty to protect the defendant's constitutional right to a fair trial from the impact of pretrial publicity:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences.... [T]he trial courts must take strong measures to ensure that the balance is never weighed against the accused .... where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should [take such measures as continuance, change of venue, sequestration, or a new trial].... But we must remember that reversals are but palliatives; **the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences.**

427 U.S. at 552–53, 96 S.Ct. at 2800, 49 L.Ed.2d at 694 (emphasis supplied) (*citing Sheppard v. Maxwell,* 384 U.S.

333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)). *See also Noriega,* 752 F.Supp. at 1049–51.

Citing Learned Hand,[13] *Nebraska Press* established a three-prong balancing test to determine whether a prior restraint is justified:

1. The nature and extent of pretrial publicity;
2. Whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and
3. How effectively a restraining order would operate to prevent the threatened danger.

427 U.S. at 562–68, 96 S.Ct. at 2804–07, 49 L.Ed.2d at 699–703. *Nebraska Press* specifically noted that "[t]he precise terms of the restraining order are also important." *Id.* at 562, 96 S.Ct. at 2804, 49 L.Ed.2d at 699.

We find the remedial measures employed by the trial court here were **necessary** to guarantee Quattlebaum's right to a fair trial.[14] Moreover, the restraint imposed by the trial court was as narrowly tailored, both in scope and duration, as was possible under the circumstances.

Here, as to the first element, although Quattlebaum's case was not extremely "sensational," it was a death penalty case which received media attention throughout the state due, in large part, to the videotape in question. We find sufficient evidence in the record from which to conclude the pretrial publicity in this case had the potential to impair the Quattlebaum's right to a fair trial. *Accord Nebraska Press,* 427 U.S. at 562–63, 96 S.Ct. at 2804, 49 L.Ed.2d at 700 (notwithstanding impact of publicity is "of necessity speculative," dealing as a court must with factors unknown and unknowable, court could reasonably conclude, based on common human experience, that publicity might impair defendant's right to a fair trial).

---

13. "[T]he gravity of the 'evil' as discounted by its improbability, justifies such invasion of free speech as is **necessary** to avoid the danger." 427 U.S. at 562, 96 S.Ct. at 2804, 49 L.Ed.2d at 699 (emphasis supplied) (*citing United States v. Davis,* 183 F.2d 201, 212 (2d Cir.1950), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)).

14. Although other measures **may** have, as discussed below, mitigated the effects of pretrial publicity, the **only** measure certain to ensure Quattlebaum's fundamental right to a fair trial was imposition of the prior restraint.

Further, we find the third prong of *Nebraska Press* is met in this case. Undoubtedly, the prior restraint prevented prospective jurors from learning the contents of the privileged communication contained on the videotape. Clearly, it prevented the threatened danger to Quattlebaum's right to a fair trial.[15]

The most troubling element of *Nebraska Press* is the second prong, whether "other measures would be likely to mitigate the effects of unrestrained pretrial publicity." The problem with application of this factor is that it is simply untenable to suggest that other measures would not, in any case, be "likely to mitigate" the effects of pretrial publicity. It could always be argued that other measures would, to some degree, "mitigate" the effects of pretrial publicity.[16] "Mitigate" is defined as "to make less severe, alleviate. . . ." NEW WEBSTER'S DICTIONARY AND THESAURUS 640 (1993). Although alternate measures might "make less severe" the effects of pretrial publicity, they could not, in this case, **ensure** Quattlebaum's right to a fair trial. Were we to premise our analysis **solely** upon whether other measures would be "likely to mitigate" the effects of pretrial publicity, then we can conceive

---

**15.** Unlike the situation in *Nebraska Press,* the prior restraint here was manageable because the only known media sources in possession of the videotape were local media television stations and newspapers. Since all parties and media in possession of the tape were restrained from disclosing its contents, the territorial problems espoused by the Court in *Nebraska Press* were much less troublesome. The fact that people may have speculated as to the contents of the videotape in question is simply insufficient to rule that Quattlebaum had not met his burden of demonstrating a prior restraint would prevent the threat to his right to a fair trial. On the contrary, this is one of those "unknown and unknowable" ramifications which, we find, justifies the trial court's conclusion that the prior restraint would prevent the harm in this case.

**16.** Under a literal application of the second prong of *Nebraska Press,* it is questionable whether the test could ever be met. *See* L. Tribe, *American Constitutional Law* 858–59 (2d Ed.1988) (Supreme Court's confidence that alternatives to prior restraints on media will adequately deter any adverse impact of publicity suggests that *Nebraska Press* acts as "a virtual bar to prior restraints" on the press); Bernabe–Riefkohl, *Prior Restraints on the Media and The Right to a Fair Trial: A Proposal for a New Standard,* 84 Ky.L.J. 259, 290–91 (1995–96) (standard of *Nebraska Press* is almost impossible to meet as a defendant cannot demonstrate that twelve impartial jurors cannot be found or that alternative measures will not eliminate risks).

of **no** situation which would meet the elements of *Nebraska Press*. We do not believe the Supreme Court intended the second prong of *Nebraska Press* to be read in isolation so as to foreclose the possibility, in all circumstances, of a prior restraint. Had it intended such a result, it would have imposed an absolute ban on prior restraints. Indeed, a majority of the Court specifically declined to do so,[17] stating:

> However difficult it may be, we need not rule out the possibility of showing the kind of threat to fair trial rights that would possess the requisite degree of certainty to justify restraint. This Court has frequently denied that First Amendment rights are absolute and has consistently rejected the proposition that a prior restraint can never be employed.

427 U.S. at 570, 96 S.Ct. at 2808, 49 L.Ed.2d at 704.

Rather, as we view the *Nebraska Press* test, it must be viewed in its entirety, with a view toward **ensuring** a defendant's fundamental right to a fair trial, and not merely with an eye toward "mitigating the effects" of pretrial publicity. As noted previously, the *Nebraska Press* Court specifically noted that such invasion of free speech as is **necessary** to avoid the danger is permissible. *See supra* note 13.[18] We find the

---

17. At least four of the justices in *Nebraska Press* advocated a position that a prior restraint on the press could, in no circumstances, be justified. *See* 427 U.S. at 570, 96 S.Ct. at 2808, 49 L.Ed.2d at 704 (Justice White concurring); *Id.* at 572, 96 S.Ct. at 2809, 49 L.Ed.2d at 705 (Justices Brennan, Stewart and Marshall concurring). *See also* Peterson, *A First Amendment–Sixth Amendment Dilemma: Manuel Noriega Pushes the American Judicial System to the Outer Limits of the First Amendment*, 25 J. Marshall L.Rev. 563, 579 (1992) (noting that concurrences in *Nebraska Press* test makes prior restraints on publication of information already obtained an impossible order to justify); Bernabe–Riefkohl, *supra* note 16, at 267 (suggesting standard set forth by Supreme Court is inoperable and confusing, and courts should adopt absolute rule against the use of prior restraints).

18. A number of courts and commentators have recognized that the "alternative measures" suggested by *Nebraska Press* are, in reality, insufficient. As one court has noted, "[e]mphatic jury instructions to disregard prejudicial publicity is an unsatisfactory solution." *Davis*, 904 F.Supp. at 569. *See also KUTV v. Wilkinson*, 686 P.2d 456 (Utah 1984) (finding neither sequestration nor voir dire were sufficient alternatives to imposition of restraining order). Additionally, it has been

limited prior restraint imposed here was necessary to avoid the potential prejudice to Quattlebaum as would ensue from disclosure of the videotape. Were we to hold otherwise, the contents of the videotape in question could have been disclosed and the substance of the privileged communication with his attorney divulged. Once disclosed, although other measures might have **alleviated** the prejudice to Quattlebaum, his right to a fair trial could not have been guaranteed.[19] In our view, the United States Supreme Court did not intend such a result in establishing the *Nebraska Press* test. Accordingly, we find the threat of prejudice to Quattlebaum's right to a fair trial justified the prior restraint here.

Our decision to affirm the circuit court's issuance of a temporary restraining order is bolstered by the uncertainty of the precise standard necessary to justify a prior restraint in

argued that other alternatives do not sufficiently safeguard the right to a fair trial:

Postponement may encroach on the accused's right of a speedy trial and may actually increase publicity in a case of great public interest; change of venue involves delay presenting the problems associated with postponement, local communities have an interest in local adjudication, and a highly publicized criminal case likely will cause prejudicial information to be disseminated nationally, rendering change of venue ineffective; voir dire cannot remove individuals who have read previous newspaper accounts and a larger jury pool may result in a greater number of people who have been exposed to prejudicial publicity or to a delay in voir dire with an enhanced opportunity for improper publicity to occur; jury sequestration is not only a drastic measure, requiring the jurors to compensate for the publicized actions of trial participants, but also lengthy jury sequestration can cause the bias of resentment, the desire to end deliberation, and cannot remove prejudice from publicity prior to impanelment and jury instructions may be ineffective regardless of pretrial publicity because the great detail present in jury instructions in a highly publicized criminal trial may not highlight precisely the issues the jurors are being instructed not to consider.

Stabile, *Free Press–Fair Trial: Can They Be Reconciled in a Highly Publicized Criminal Case*, 79 Geo.L.J. 337, 343–45 (1990). *See also* Isaacson, *Fair Trial and Free Press: An Opportunity for Coexistence*, 29 Stan.L.R. 561 (1990) (recognizing inadequacy of alternative measures set forth in *Nebraska Press* and *Sheppard v. Maxwell*); *Davis*, 904 F.Supp. at 568–69.

**19.** Once a privileged communication has been disclosed to the public, it can never be recalled and the right to a fair trial may have been forever jeopardized. *Accord United States v. Davis*, 904 F.Supp. 564, 569 (E.D.La.1995) (it is difficult, if not impossible, to "unring a bell").

cases in which the defendant claims, not only that pretrial publicity threatens his right to a fair trial, but also that his attorney client privilege has been violated, thereby jeopardizing his right to effective assistance of counsel.[20] We refer to the uncertainty created by the decisions of the District Court, and the Eleventh Circuit Court of Appeals, in *United States v. Noriega*. *See supra* note 11.

As noted in Footnote 11, the *Noriega* cases involved the recording of Manuel Noriega's privileged telephone calls with his attorneys while in prison in Florida. The United States District Court for the Southern District of Florida temporarily restrained CNN, which had gained possession of the tapes, from broadcasting the recordings until it could determine **whether** broadcasting the tapes would prejudice Noriega's trial. 752 F.Supp. 1032 (S.D.Fla.1990) (*Noriega 1* ). Clearly, this does not comport with the *Nebraska Press* three-prong test as that test requires a showing of prejudice in the first instance before a prior restraint is ever justified. Nonetheless, the Eleventh Circuit upheld the restraining order. 917 F.2d 1543 (11th Cir.1990) (*Noriega 2* ).[21] In doing so, the Eleventh Circuit noted that "the determination of whether the telephonic communications between Noriega and his defense counsel are privileged, while not **necessarily** dispositive of whether such communication should be publicly broadcast, would be relevant to the District Court's assessment of potential harm to Noriega's right to a fair trial." *Id.* at 1551. The Supreme Court denied certiorari, over the dissent of Justices Marshall and O'Connor. 498 U.S. 976, 111 S.Ct. 451, 112 L.Ed.2d 432 (1990).

---

**20.** In *Noriega 3*, the District Court, on remand, analyzed the claims as two separate prongs: the defendant's Sixth Amendment right to a fair trial, and his Sixth Amendment right to effective assistance of counsel. It applied the three prong *Nebraska Press* test to both rights.

**21.** A number of commentators have recognized misapplication of the *Nebraska Press* test in *Noriega 1* and *Noriega 2*. *See* Peterson, *supra* note 17, at 563; Splichal and Bunker, *The Supreme Court and Prior Restraint Doctrine: An Ominous Shift?*, 3–SPG Media L. & Pol'y 9 (1994); Schweiker, *United States v. Noriega: Conflicts Between the First Amendment and Rights to a Fair Trial and Privacy*, 1993 U.Chi. Legal F. 369, 374 (1993).

In light of the opinions in *Noriega 1 and Noriega 2*, it is uncertain precisely how the Supreme Court would rule if faced directly with the issue of a prior restraint in the context of the media's threatened disclosure of confidential conversations obtained in violation of the attorney client privilege. At least one commentator has speculated that the denial of certiorari in *Noriega* leaves open the possibility that the *Nebraska Press* standard is open to revision. *See* Splichal and Bunker, *The Supreme Court and Prior Restraint Doctrine: An Ominous Shift?*, 3–SPG Media L. & Pol'y 9, 11, 12 (1994) (speculating that alarm expressed in dissenting opinion in Supreme Court's denial of certiorari suggests a majority of the Court might be willing to give judges a freer reign in balancing First Amendment principles with fair trial concerns). Accordingly, in light of the confusion surrounding the *Noriega* cases,[22] we find the matter is better left to the United States Supreme Court for resolution. Should that Court wish to establish an alternative standard from that set forth in *Nebraska Press*, or to adopt an absolute ban on prior restraints, it is free to do so.

## CONCLUSION

It is difficult to conceive of a situation in which the rights of a defendant to a fair trial were more at jeopardy than the instant case.[23] If Quattlebaum's Sixth Amendment rights were insufficient to justify imposition of the prior restraint in this case, we can think of no situation in which a prior restraint would ever be justified or in which alternative measures would not be found sufficient to mitigate any threatened

---

**22.** Although the Eleventh Circuit ultimately concluded Noriega was not entitled to **continuation** of the restraining order, 752 F.Supp. 1045 (S.D.Fla.1990) (*Noriega 3*), that decision was based in large part on the fact that the tapes in question contained only two conversations falling within the attorney client ambit, one of which had already been broadcast by CNN, and the other of which was so "cryptic and disjointed" that Noriega's counsel conceded it was not prejudicial insofar as impaneling an impartial jury was concerned. *Id.* at 1053. *Noriega 3* sheds no light on the appropriate standard to be applied in cases such as that presently before the Court.

**23.** Unfortunately, both this Court's and the lower court's hands are somewhat "tied" in this case in that it is impossible, without disclosing the contents of the videotape, to accurately portray the potential prejudice to Quattlebaum.

prejudice. Since *Nebraska Press* did not foreclose the possibility that there may be situations in which a prior restraint is justified, we find the egregious circumstances of this case sufficient to warrant imposition of the extremely limited temporary restraining order imposed by the circuit court.[24] Any contrary holding would potentially have denied Quattlebaum's fundamental right to a fair trial and have been shocking to the universal sense of justice; such a result will not be endorsed by this Court. Accordingly, the judgment below is

**AFFIRMED.**

FINNEY, C.J., MOORE and BURNETT, JJ., concur.

TOAL, J., concurring and dissenting in separate opinion.

TOAL, Justice:

I concur as to the majority's discussion of subject matter jurisdiction and personal jurisdiction, but dissent as to the validity of the prior restraint.

At the outset, it is essential to understand that all prior restraints are not equal. It is also important to understand what the present prior restraint is, and what it is not. The prior restraint here is a **judicial** restraint on the disclosure by the press of an attorney's private consultation with his client. By restraining publication, the trial court has attempted to protect and preserve the integrity of a criminal trial and the constitutional values which inhere therein. What this prior restraint is not is an executive, legislative, or judicial prior restraint of the expression of an opinion. It is also not a permanent restraint on the publication of the attorney-client conference.

The First Amendment to the United States Constitution provides, "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I. On its face, the provision seems to apply only to legislative

---

**24.** As noted previously, the order on appeal does not prohibit publication of the existence of the videotape, or the fact of the invasion of the attorney client privilege. It does not even prohibit the videotape itself from being aired by the media; it merely restricts dissemination of the contents of the privileged communication itself, or the characterization of the contents.

abridgements of free speech, restricting as it does congressional action.[1] The application of the First Amendment to judicial prior restraints is a late twentieth century phenomenon.[2] Although the history of the drafting of the First Amendment, as well as the literal language of the amendment itself, suggest that it was intended solely as a limitation on legislative restraints of speech and the press, today it is assumed that this language encompasses judicial restraints. In modern First Amendment litigation no 'one questions whether or not the prohibition against judicial prior restraints might be limited to orders based on statutes. Perhaps the time has passed when such a question could be seriously addressed by an appellate court. But what should legitimately be revisited in the view of the majority, and in my view, is whether or not the same analysis should be applied to *all* judicial prior restraints.

A fair trial is guaranteed to litigants in both civil and criminal disputes. Does it make a difference whether the judicial prior restraint is simply a device to prevent premature publicity of matters at issue in a civil or criminal trial as opposed the prior restraint at issue in the instant capital murder case where the court also seeks to safeguard such constitutional values such as the protection against self-incrimination, the right to an attorney of the defendant's choosing, and the right to a speedy trial?

---

**1.** *See* Mark P. Denbeaux, *The First Word of the First Amendment*, 80 Nw.U.L.Rev. 1156 (1986) (arguing that a First Amendment basis for striking down judicial prior restraints rests on a "shaky foundation" and that the Fourteenth Amendment due process clause would be the better source for restricting state courts in this regard).

**2.** The Supreme Court's first case involving a judicial prior restraint was *Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). In *Carroll*, the trial court issued an order restraining a white supremacist organization from holding, for more than ten months, rallies or meetings that would tend to disturb and endanger the citizens of the county. The judicial proceedings held to consider the order were conducted *ex parte* with no notice being given to the white supremacist group. The Supreme Court ultimately struck down the judicial prior restraint, stating, "The issuance of an injunction which aborts a scheduled rally or public meeting, even if the restraint is of short duration, is a matter of importance and consequence in view of the First Amendment's imperative." 393 U.S. at 184, 89 S.Ct. at 353, 21 L.Ed.2d at 333.

Presently, the rigid *Nebraska Press* test is the only tool trial judges have to address questions of prior restraint, whether legislative or judicial, whether in the criminal or civil context, and whether in the high-profile capital murder case or misdemeanor traffic court. While there is a certain elegant simplicity in "bright line" tests from the standpoint of appellate judges, such tests really do not give meaningful and practical guidance to trial judges.

In high-profile criminal cases, trial judges frequently encounter a media frenzy which they must deal with in a matter of hours. In this case, the police taped defendant's very first conversation with his lawyer, just after he was arrested for murder. The prosecution retained this tape for over a year unbeknownst to defendant or his lawyer. The tape was leaked to the largest television station in the area from which defendant's jury would be selected. The possibility of a tainted jury venire was very real. The trial judge proposed to solve this dilemma by restraining the media from publishing the attorney-client conversation until the jury had been empaneled. The television station involved here was responsible enough to voluntarily restrain publication of the surreptitiously taped attorney-client conference until a hearing could be held.

The *Nebraska Press* test requires the trial court to make detailed findings on all available alternatives. This may be unrealistic in the real world of high-profile criminal trials. Additionally, it forces the trial judge to make choices between other constitutional values. It may always be possible to posit other "possible" alternatives to judicial prior restraints. If a trial judge has to eliminate all other alternatives (a crystal ball exercise since none of the "alternatives" will have been put into play), then in reality there exists an absolute prohibition against any prior restraint. Are the protections of the Fifth and Sixth Amendments thus sacrificed to the demands of the modern day media for instant public dissemination of any information to which it falls privy no matter the impact on the fairness of the trial? In the final analysis, *Nebraska Press*, for all its language to the contrary, may have effectively established the constitutional doctrine that the First Amendment trumps the Fifth, Sixth, and Fourteenth Amendments.

The majority opinion is a scholarly and thoughtful review of the leading authorities on the question of whether a prior restraint of the press can ever be ordered by a trial judge in this country. The majority argues that the application of the *Nebraska Press* test here damages the defendant's most fundamental due process rights in three important respects. First, the sanctity of his attorney-client privilege has been invaded. Second, his Fifth Amendment right against compulsory self-incrimination has potentially been compromised. Finally, the selection of the normal alternatives to the prior restraint, including continuance of the case until public attention abates, change of venue to a locale not so infected with the pre-trial publicity, and voir dire questioning of the jury to eliminate any biased jurors, impairs the defendant's right to a speedy trial by a jury of his peers.

As noted above, I agree with the majority that the *Nebraska Press* test should be revisited by the Supreme Court. A standard must be formulated that adequately addresses the pressures and complex constitutional concerns that accompany a high-profile murder case. That said, I find myself compelled to dissent under the current state of the law. Further, the majority's proposed standard falls short of the kind of sophisticated test required in this situation. Although more flexibility in issuing a prior restraint may be deserving in a case such as this, it should not result in a "rubber stamped" restraint whenever there is any potential prejudice to the defendant. An examination of less restrictive alternatives must remain part of the analysis.

As discussed by the majority, in this century the United States Supreme Court has consistently interpreted the First Amendment as mandating a "heavy presumption" against the constitutional validity of prior restraints. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Carroll v. President and Com'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). This presumption is largely the result of Justice Oliver Wendell Holmes's famous declaration in *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907): "[T]he main purpose of [the First Amendment] is to prevent all such *previous restraints* upon publications as had

been practiced by other governments."[3] The question before this Court is at what point must this "heavy presumption" give way to a defendant's right to a fair trial.

In *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the United States Supreme Court addressed this very issue. The defendant was charged with murdering six members of a family in the small town of Sutherland, Nebraska, a town of about 850 people. Due to the notoriety of the case, the trial court issued an order prohibiting the press from publishing specific aspects of the trial. The Nebraska Supreme Court upheld the restraint with some modifications. The United States Supreme Court reversed, finding the prior restraint invalid under its three-prong test.

In this case, the majority questions the second prong of the *Nebraska Press* test. The majority states that under this prong no situation can be conceived of in which a prior restraint would be justified because alternative measures would almost always be likely to mitigate the effects of pretrial publicity. The majority asserts that such a standard is untenable as it would be impossible for a court to ensure a defendant's Sixth Amendment right to a fair trial. I share the majority's concern and agree that the second prong of the *Nebraska Press* test should not be read in isolation. The test itself does not require invalidation of a prior restraint solely because other measures might mitigate the effects of the pretrial publicity. It is a balancing test. A court must consider the degree to which other measures will mitigate the adverse effects of the pretrial news coverage in light of the nature and extent of that publicity. *See Nebraska Press*, 427 U.S. at 569, 96 S.Ct. at 2807, 49 L.Ed.2d at 703 ("We cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint

---

**3.** Holmes's interpretation of the First Amendment had its origins in Blackstone's *Commentaries:* "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published." 4 William Blackstone, Commentaries 151; *see* G. Edward White, *Justice Holmes and the Modernization of Free Speech Jurisprudence: The Human Dimension,* 80 Cal.L.Rev. 391, 398 (1992).

unnecessary."). The presumption, however, is heavily in favor of using alternative measures. As noted by the Court in *Nebraska Press*, "our conclusion [that the prior restraint is invalid] is not simply a result of assessing the adequacy of the showing made in this case; it results in part from the problems inherent in meeting the heavy burden of demonstrating, in advance of trial, that without prior restraint a fair trial will be denied." *Nebraska Press*, 427 U.S. at 569, 96 S.Ct. at 2807–08, 49 L.Ed.2d at 703.

In this case, there is little doubt that other measures might mitigate the effects of the pretrial publicity. The pertinent question under *Nebraska Press* is whether such alternatives would **sufficiently** mitigate those effects. Under the current state of the law, I am compelled to answer yes to this question.

The Supreme Court's first prior restraint decision was *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, which involved a legislative restraint on publication. By invalidating the restraint, the Court in *Near* echoed Holmes's earlier proclamation in *Patterson* that the primary objective of the First Amendment was to avoid prior restraints. Quoting James Madison, the Court stated, " 'This security of the freedom of the press requires that it should be exempt not only from previous restraint by the Executive, as in Great Britain, but from legislative restraint also.' " *Near*, 283 U.S. at 714, 51 S.Ct. at 630, 75 L.Ed. at 1366. The Court further observed, "The preliminary freedom [of the press] extends as well to the false as the true." *Id.*

It was not until 1968 that the Supreme Court added to its First Amendment jurisprudence a presumption against **judicial** prior restraints. *See Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325. The Court's invalidation of judicial prior restraints came without an explanation of why the First Amendment was applicable to such orders. *Id.* (simply concluding that there is a "heavy presumption" against prior restraints under the First Amendment). In *New York Times Company v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the government sought to enjoin the New York Times and the Washington Post from publishing a classified study of the

Vietnam war. Despite the weighty countervailing interest of national security, the Supreme Court refused to sustain the judicial prior restraint. In a concurring opinion, Justice Black borrowed James Madison's remarks concerning the Bill of Rights: " 'the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable.' " *New York Times,* 403 U.S. at 716, 91 S.Ct. at 2142, 29 L.Ed.2d at 826.

The majority emphasizes that the Supreme Court in *Nebraska Press* declined to assign priorities between the First and Sixth Amendments. As such, the majority seeks to take advantage of this apparent indecision by suggesting the primacy of the Sixth Amendment. The majority notes that "a number of lower courts have held that a defendant's Sixth Amendment right to a fair trial is superior to the right of free speech and that, where the two rights collide, the latter must give way to the former." However, none of the cases cited by the majority involved prior restraints.[4] In fact, these cases explicitly distinguished prior restraints from other restrictions on freedom of expression and acknowledged the virtual per se invalidity of the former.

---

4. The majority's references to *Estes v. State of Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) are also unavailing. In *Estes,* the Supreme Court faced the issue of whether television cameras in the courtroom violated the defendant's due process rights under the Fourteenth Amendment. The issue had nothing to do with the validity of a prior restraint. The only remedy available to the defendant was a reversal of his conviction. Finding the defendant's due process rights were violated, the Court stated, "We have always held that the atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs." 381 U.S. at 540, 85 S.Ct. at 1632, 14 L.Ed.2d at 549. The Court then observed, "Our approach has been through rules, contempt proceedings and reversal of convictions obtained under unfair conditions." *Id.* The Court in no way intimated that it intended to elevate an accused's right to a fair trial above the well established presumption against prior restraints.

In *Press–Enterprise,* the Court dealt with the right of the public to attend *voir dire* proceedings in a criminal case. The case did not deal with a prior restraint. The Court invalidated the trial court's order to close the proceedings and vindicated the public's right to attend the proceedings. The Court found that the trial judge had failed to consider alternatives to closure and did not make findings sufficiently specific for review by an appellate court.

In *News–Journal Corporation v. Foxman*, 939 F.2d 1499 (11th Cir.1991), the Eleventh Circuit faced the question of whether a trial court could limit extrajudicial commentary of trial participants. Citing *Nebraska Press*, the Eleventh Circuit noted that such orders were less restrictive than prior restraints on the press for averting the effects of prejudicial pretrial publicity. The court further recognized that there was a "heavy presumption" against prior restraints. *See Foxman*, 939 F.2d at 1512 (*citing Nebraska Press*). The court reiterated the Supreme Court's recommendation to use measures other than prior restraints in mitigating the effects of pretrial publicity. Consequently, the Eleventh Circuit found the restriction on extrajudicial statements to be an acceptable alternative.[5]

Like the court in *Foxman*, the Second Circuit in *Application of Dow Jones & Company* 842 F.2d 603 (2d Cir.1988), *cert. denied*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988), addressed the constitutionality of a lower court order restricting extrajudicial statements by trial participants. In distinguishing prior restraints from the restriction before it, the court stated,

[T]here is a substantial difference between a restraining order directed against the press—a form of censorship which the First Amendment sought to abolish from these shores—and the order here directed solely against trial participants and challenged only by the press. The distinction is critical.

The most offensive aspect of a prior restraint is the censorship involved by forbidding the dissemination of information already known to the press and therefore public. A prior restraint deprives the public of specific news because it prevents publication. Although the restraining order in this case limits the flow of information readily available to the news agencies—and for that reason might have an effect similar to that of a prior restraint—the fact that the order is not directed at the news agencies and that they therefore cannot be haled into court for violating its terms deflates what would otherwise be a serious concern regarding judi-

---

**5.** *See also* Stabile, *Free Press—Fair Trial: Can They Be Reconciled in a Highly Publicized Criminal Case?*, 79 Geo.L.J. 337 (1990).

cial censorship of the press. For this reason the order is considerably less intrusive of First Amendment rights than one directly aimed at the press.

*Application of Dow Jones & Company,* 842 F.2d at 608.

These cases demonstrate that while it may be permissible for a court to restrict some First Amendment freedoms in order to protect a defendant's right to a fair trial, it is almost never acceptable for a court to impose a prior restraint.[6] At most, the two interests share equal prominence in the Constitution.

The Supreme Court in *Nebraska Press* sought to reconcile these interests without creating an arbitrary hierarchy. First, the Court recognized that "[a] prior restraint, . . . by definition, has an immediate and irreversible sanction." *Nebraska Press,* 427 U.S. at 559, 96 S.Ct. at 2803, 49 L.Ed.2d at 697–98. Conversely, pretrial publicity does not inflict an immediate injury but only poses "a **risk** that [the publicity will] have some adverse impact on the attitudes of those who might be called as jurors." *Id.* at 569, 96 S.Ct. at 2807, 49 L.Ed.2d at 703 (emphasis added). In other words, any injury to the defendant is measured by probability; whereas, the prior restraint is a present transgression of a core constitutional right. By employing the remedial measures suggested in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966),[7] the prior restraint is immediately rectified and any future risk of not having a fair trial is cured. This is exactly what the second prong of the *Nebraska Press* test attempts to achieve. *See U.S. v. Noriega,* 752 F.Supp. 1045, 1054 (S.D.Fla.1990) ("If nothing else, *Nebraska Press* stands for the

---

**6.** *See also Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir.1975) (finding that there was no prior restraint, and therefore, the court did not have to begin its examination with a "heavy presumption" against validity); *United States v. Davis,* 904 F.Supp. 564 (E.D.La.1995); Stabile, 79 Geo.L.J. at 341 ("While it may be permissible to restrict freedom of expression in order to protect a defendant's right to a fair trial, not all means of restriction are acceptable.").

**7.** These measures include: (1) change of trial venue to a place less exposed to the publicity; (2) postponement of the trial; (3) questioning of prospective jurors; (4) jury sequestration; and (5) clear instructions to the jury to decide issues only on the evidence. *See Nebraska Press,* 427 U.S. at 563–64, 96 S.Ct. at 2805, 49 L.Ed.2d at 700.

proposition that speculative harm falls well short of the showing necessity for the imposition of a prior restraint.").

As discussed above, any injury to Quattlebaum is measured solely by probability. All the while, the constitutional infirmity of the prior restraint persists. Therefore, to justify such an immediate and profound infringement of the First Amendment, *Nebraska Press* requires a finding that, absent the prior restraint, the defendant **will** be denied a fair trial. The record here simply does not support such a conclusion. The trial court's consideration of alternative measures was, at best, cursory. The trial court failed to make **specific** findings regarding the degree to which other measures would mitigate the effects of the pretrial publicity.[8] Such findings are basic to the balancing required by *Nebraska Press*. If the trial court had explored each of the alternatives, it would have had to conclude that the prior restraint was not necessary.[9]

Finally, the majority asserts that its decision to affirm the restraining order is "bolstered by the uncertainty of the precise standard necessary to justify a prior restraint in cases in which the defendant claims, not only that pretrial publicity threatens his right to a fair trial, but also that his attorney-client privilege has been violated, thereby jeopardizing his right to effective assistance of counsel." Again, I join the majority's frustration in not having a more suitable test with which to address the unique and profound constitutional concerns presented in this case. Nevertheless, under current case law, I remain compelled to conclude that the prior restraint here must be struck down.

In *United States v. Noriega*, 752 F.Supp. 1032 (S.D.Fla. 1990) (*Noriega I* ), the federal district court faced the question of whether to restrain the publication of privileged conversations between Noriega and his defense team. The court imposed a temporary restraining order until it could review

---

**8.** The trial court simply concluded, "The publication or the transmission of that privileged communication, or its characterization would make it much more unlikely that the defendant could obtain a fair and impartial trial, given even all the protections that our system has in place to ensure a fair and impartial trial."

**9.** Even the majority admits that this case is not "extremely sensational."

the tapes. The Eleventh Circuit affirmed the district court's order. 917 F.2d 1543 (11th Cir.1990) (*Noriega II* ). The majority suggests that *Noriega I* and *Noriega II* create doubt as to the applicability of the *Nebraska Press* test in cases involving privileged communications. In *Noriega III,* the district court explicitly sought to dispel such an interpretation. 752 F.Supp. 1045 (S.D.Fla.1990). The court stated that "[i]n order to make the factual findings mandated by *Nebraska Press,* it was necessary to review the subject tapes." 752 F.Supp. at 1049. The court further noted that it had to contend with CNN's refusal to produce the tapes, and as a result, the court imposed the temporary restraining order. However, the court emphasized that its decision was not a comment on the priority between Noriega's First and Sixth Amendment rights. *Id.* at 1051 ("the court had *not* then concluded that Noriega's Sixth Amendment right to a fair trial out-weighed CNN's First Amendment right to be free of prior restraints on publication . . . .").

In *Noriega III,* the district court summarized the inquiry mandated by the Eleventh Circuit in *Noriega II:*

[T]he fact that conversations may or may not fall within the protections of the [attorney-client] privilege has no bearing on whether Noriega's right to an impartial jury will be clearly and irreparably harmed by publication. . . . Guaranteeing Noriega's right to counsel involves an equally serious but much **narrower** inquiry. There, the court is concerned only with the extent to which the publication of legitimately privileged communications would prejudice Noriega's defense were those protected conversations to fall into the hands of the prosecution.

*Id.,* 752 F.Supp. at 1051–52 (emphasis added). Thus, the significance of the attorney-client privilege is limited to a determination of whether the prosecution would be prohibited from obtaining the communications; and if so, whether the communications would have prejudiced the defendant's case if actually viewed by the prosecution. Even if a defendant could establish prejudice as a result of the prosecution gaining access to the conversations, a court would be required to explore less intrusive alternatives in order to avoid the prior restraint. *Id.* at 1054. ("Even if Noriega were able to meet his burden of establishing demonstrable prejudice upon the

prosecution's gaining access to these conversations, the court would in all likelihood refrain from imposing a prior restraint on the press.").[10]

Freedom of the press from prior restraints is the quintessential right under the First Amendment. However, the presumption against prior restraints must not eviscerate those rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments. A more sophisticated test is required in order to effectively address the complex constitutional concerns that may arise in any given criminal trial. The prerogative to change the prior restraint standards is the province of the United States Supreme Court. The majority makes a thoughtful and practical challenge to the current *Nebraska Press* test. I join the majority's plea for a change, but until the Supreme Court revises the current test, it binds us.

For the foregoing reasons, I respectfully dissent.

---

**10.** The court noted that other less drastic alternatives included sequestration of the prosecution and dismissing members of the prosecution team or excluding evidence and witnesses.