**In re The PEOPLE of the State of Colorado, Plaintiff**

**v.**

**Kobe Bean BRYANT, Defendant.**

No. 04SA200.

Supreme Court of Colorado,
En Banc.

July 19, 2004.

Faegre & Benson, L.L.P., Thomas B. Kelley, Steven D. Zansberg, Christopher P. Beall, Eileen Kiernan–Johnson, Denver, Colorado, Attorneys for Petitioners, The Associated Press; CBS Broadcasting, Inc.; Denver Post Corporation; ESPN, Inc.; FOX News Network, L.L.P.; Los Angeles Times; and Warner Brothers Domestic Television.

Ken Salazar, Attorney General, Matthew D. Grove, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent, District Court for Eagle County.

Mark Hurlbert, District Attorney, Matthew S. Holman, First Assistant Attorney General and Special Deputy District Attorney, Eagle, Colorado, Attorneys for District Attorney, Fifth Judicial District.

Justice HOBBS delivered the opinion of the court.

Pursuant to C.A.R. 21, we accepted jurisdiction in this original proceeding to review an order by the District Court for Eagle County in a criminal prosecution against Kobe B. Bryant for allegedly sexually assaulting a woman.

In accordance with section 18–3–407(2), 6 C.R.S. (2003), ("rape shield statute")[1] the District Court, on June 21 and 22, 2004, held *in camera* proceedings regarding the "relevancy and materiality of evidence of specific instances of the victim's ... prior or subsequent sexual conduct, or opinion evidence of the victim's ... sexual conduct." § 18–3–407(2)(a).

On June 24, 2004, the court reporter mistakenly sent the transcripts of the *in camera* proceedings by electronic transmission to seven media entities ("Recipients") via an electronic mailing list for subscribers to public proceeding transcripts in the case, instead of using only the electronic mailing list for persons authorized to receive transcripts of *in camera* proceedings. There is no dispute that this was an error, and no dispute that the Recipients would otherwise not have received the transcripts.

The District Court's October 31, 2003, order previously entered in this case prohibits court personnel from disclosing to any unauthorized person information that is not part of the court's public records:

> Court personnel shall not disclose to any unauthorized person information relating to a pending criminal case that is not part of the public records of the court and that is likely to create a grave danger of imminent and substantial harm to the fairness of the trial proceedings.

Upon discovering the transmission mistake, the court reporter immediately notified the District Court, which promptly issued its June 24th order to the Recipients:

> It has come to the Court's attention that the *in camera* portions of the hearings in this matter on the 21st and 22nd were erroneously distributed. These transcripts are not for public dissemination. Anyone who has received these transcripts is ordered to delete and destroy any copies and not reveal any contents thereof, or be subject to contempt of Court.
>
> So Ordered this 24th day of June 2004.

Four days later, the Recipients filed their original proceeding petition, asking that we exercise jurisdiction to review the District Court's order and set it aside as an unconstitutional prior restraint against publication, in violation of the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution. Keeping the District Court's order in effect for purposes of our accelerated review, we have received answer briefs from the Colorado Attorney General on behalf of the District Court and from the District Attorney for Eagle County. The Recipients filed their reply brief. We now enter our decision.

We determine that the District Court's order is a prior restraint against publishing the contents of the transcripts. We also determine that, narrowly tailored, the prior restraint is constitutional under both the United States and the Colorado Constitutions. The state has an interest of the highest order in this case in providing a confidential evidentiary proceeding under the rape shield statute, because such hearings protect victims' privacy, encourage victims to report sexual assault, and further the prosecution and deterrence of sexual assault.

For purposes of this opinion we assume that the District Court could rule that some of the contents of the June 21 and June 22 *in camera* hearings may be relevant and material and therefore admissible at the public trial. The state's interest will be served by preventing the further dissemination and any reporting of all or any portion of the contents of the *in camera* transcripts that are not relevant and material under the rape shield statute. We strike that portion of the District Court's order that requires Recipients to delete the electronic transmission and destroy any and all copies of the *in camera* transcripts. Consistent with the First Amendment and the state's interest, we therefore order the District Court to: (1) make its rape shield rulings as expeditiously as possible and promptly enter its findings of facts and conclusions of law thereon; (2) determine if some or all portions of the June 21 and June 22 transcripts are relevant and material and, therefore, admissible under the rape shield statute at trial; and (3) enter an

---

1. In this opinion, we use the term "victim" as it is used under the rape shield statute. It implies nothing with respect to the veracity of the charges.

appropriate order, which may include releasing to the Recipients and the public a redacted version of the June 21 and June 22 transcripts that contains those portions that are relevant and material in the case, if any, and maintains the ongoing confidentiality of portions that are irrelevant and immaterial, if any.

Although we believe the District Court's order is also sufficiently clear and narrow on this point, we emphasize that our judgment applies only to the contents of the June 21 and June 22 *in camera* transcripts. Publication of information the media has obtained or obtains by its own investigative capacities is not limited by the District Court's order or our judgment, even though such information may also be spoken of or referred to in the transcripts.

## I.

### Facts and Procedural Background

By its Complaint/Information dated July 18, 2003, the state of Colorado alleges that Defendant Bryant, on June 30, 2003, committed forcible sexual penetration of a woman in Eagle County, Colorado, against her will, in violation of sections 18–3–402(1)(a), – 402(4)(a), 6 C.R.S. (2002) a class 3 felony. The District Court has scheduled the trial to begin on August 27, 2004.

This criminal prosecution has received extraordinary media attention from the outset, fueled by Defendant Bryant's international reputation as an all-star professional basketball player and the sexual assault charge made against him. In order to facilitate public access to the proceedings in this case, the Eagle County District Court—through the State Court Administrator's Office—has maintained an electronic scheduling archive on the Colorado Courts' webpage that contains links to publicly accessible documents.[2]

Among these publicly accessible documents is the June 17, 2004, memorandum addressed by the District Court to "Members of the Media." It states that the District Court will hold hearings at the Eagle County Justice Center on the Bryant case on Monday, June 21, and Tuesday, June 22, 2004, a portion of which will be open to the public and a portion closed: "The courtroom will be open for the opening portions of this proceeding ... the remainder of the proceeding will be conducted in closed court." June 17, 2004 Memorandum to Members of the Media, at http://www.courts.state.co.us/exec/media/eagle/seating/june_21-22_memo.doc.

The June 18, 2004 "Amended Scheduling Order For June 21st and 22nd Hearing" lists eight items that will be held in open court and five items that will be held *in camera* after completion of the open matters. The *in camera* items are listed as:

1. Oral argument re: Defense Motion to Strike Testimony of Dr. Baden.
2. Other issues with regard to endorsed expert witnesses.
3. Continuation and Completion of Rape Shield Evidence.
4. Further proceedings concerning Crime Victim Compensation Records, including Defense Motion for Use at Trial.
5. Any other outstanding issues.

As the scheduling order intimates, the District Court has held prior *in camera* proceedings involving rape shield evidence, and transcripts of them have not been available except to the parties and persons authorized by the District Court to have and review them. The court reporter mistakenly transmitted the transcribed *in camera* proceedings for June 21 and 22, along with the transcribed public proceedings for June 21, to the Recipients. The notation " * * IN CAMERA PROCEEDINGS * * " is marked on every page of the transcript containing information from the closed portions of the proceedings. The mistake occurred because the court reporter maintained an electronic list for media entities subscribing to transcripts of the public proceedings in the case.

Our review of the transcripts under seal demonstrates that the pages bearing the label " * * IN CAMERA PROCEEDINGS * * " are concerned with evidence and arguments relating to the victim's sexual conduct before and after her sexual encounter with the Defendant Bryant.

**2.** Colorado Judicial Branch, *People v. Bryant Me-* *dia Information,* at http://www.courts.state.co.us.

As recited in their "Emergency Petition for Immediate Relief in the Nature of Prohibition or Mandamus and for Issuance of a Rule to Show Cause Pursuant to C.A.R. 21" filed with us on June 28, 2004, Recipients were preparing stories about the *in camera* proceedings when they received notification of the District Court's June 24, 2004, signed order preventing further release of the contents of the *in camera* transcripts.

We exercised our original jurisdiction on June 29, 2004, and ordered expedited briefing. Recipients contend that the District Court's order is an unconstitutional prior restraint violating the First Amendment. The Attorney General and the District Attorney for Eagle County contend that the order is not a prior restraint, or alternatively, that it is a constitutional prior restraint.

The District Court's order and the original proceeding before us involve only the *in camera* proceeding transcripts for June 21 and June 22, and do not concern any information the media may have obtained through its investigative capacities.

We determine that the District Court's order prohibiting further release of the contents of the *in camera* proceeding transcripts is a prior restraint, but properly narrowed, is not unconstitutional. In conducting our analysis, we first examine the applicable First Amendment law; then, we turn to the state's interest of the highest order in protecting the transcribed *in camera* proceedings from public dissemination, as set forth in Colorado's rape shield statute.

## II.

### First Amendment Prior Restraint Law

■ The First Amendment limits the choices the government may make in its efforts to regulate or prohibit speech, but it does not bar all government attempts to regulate speech, and it does not absolutely prohibit prior restraints against publication. *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 570, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Hill v. Thomas,* 973 P.2d 1246, 1252 (Colo.1999), *aff'd,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

■ The term "prior restraint" describes "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). Prior restraint of publication is an extraordinary remedy attended by a heavy presumption against its constitutional validity. *CBS, Inc. v. Davis,* 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994) (Blackmun, J., in chambers); *N.Y. Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). "The thread running through [the prior restraint cases] is that prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press,* 427 U.S. at 559, 96 S.Ct. 2791.

■ To justify a prior restraint, the state must have an interest of the "highest order" it seeks to protect. *Fla. Star v. B.J.F.,* 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). The restraint must be the narrowest available to protect that interest; and the restraint must be necessary to protect against an evil that is great and certain, would result from the reportage, and cannot be mitigated by less intrusive measures. *CBS, Inc.,* 510 U.S. at 1317, 114 S.Ct. 912 (citing *Neb. Press,* 427 U.S. at 562, 96 S.Ct. 2791).

■ The decisions of the United States Supreme Court teach that free discussion of public policy issues and criticism of public officials cannot be restrained. *See Near v. Minnesota,* 283 U.S. 697, 717, 722, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Accordingly, the courts cannot enjoin newspapers from publishing contents of a classified federal government study on United States war policy. *N.Y. Times,* 403 U.S. at 714, 91 S.Ct. 2140. Nor can a speculative concern about the impact of pre-trial publicity on prospective jurors justify a prior restraint. *Neb. Press,* 427 U.S. at 563, 570, 96 S.Ct. 2791. Nor can a judge who allowed reporters to attend the trial of a juvenile—notwithstanding a state statute closing such trials—prohibit the news media from publishing the juvenile's name or photograph. *Okla. Publ'g Co. v. Dist. Court,*

430 U.S. 308, 311–12, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977). Additionally, potential harm to an economic interest is not sufficient to justify a prior restraint. *CBS, Inc.*, 510 U.S. at 1318, 114 S.Ct. 912.

In cases dealing with the conflict between truthful reporting and state-protected privacy interests, the Supreme Court—when reviewing the validity of sanctions following publication—has held unconstitutional a civil damages award entered against a television station for broadcasting the name of a rape-murder victim it had obtained from publicly available courthouse records. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 472–73, 496–97, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Likewise, two newspapers learned the name of a juvenile offender from talking to witnesses and subsequently published the name, despite a state statute forbidding such publication. *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99–100, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979). The Supreme Court held that the indictment of the two newspapers for violating the statute was unconstitutional. *Daily Mail*, 443 U.S. at 105–06, 99 S.Ct. 2667. The Supreme Court also invalidated a sanction imposed for publication of an article identifying judges whose conduct was being investigated, despite the state's provision for confidentiality in judicial discipline proceedings. *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 831, 845–46, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).

Nevertheless, the Supreme Court has recognized that protecting the privacy of rape victims is a highly significant state interest, requiring courts to consider both the First Amendment and the compelling privacy interests in the particular factual context of the case in reaching their decisions. *Fla. Star*, 491 U.S. at 530, 537, 109 S.Ct. 2603. "We continue to believe that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Id.* at 533, 109 S.Ct. 2603.

In *Florida Star*, the Sheriff's Department publicly posted a police report containing a sexual assault victim's name. *Id.* at 527, 109 S.Ct. 2603. Under the circumstances, the Supreme Court determined that a civil damages award against the newspaper for revealing the name violated the First Amendment. *Id.* at 541, 109 S.Ct. 2603. But the Court said it was not holding that "truthful publication is automatically constitutionally protected, or that there is no zone of personal privacy within which the state may protect the individual from intrusion by the press, or even that a state may never punish publication of the name of a victim of a sexual offense." *Id.* at 541, 109 S.Ct. 2603.

We therefore turn to Colorado's rape shield statute, which serves purposes the Supreme Court identified in *Florida Star* as being of the highest order.

## III.

### Colorado's Rape Shield Statute

Rape is among the most intimate and personally-devastating invasions a person may experience in his or her lifetime.[3] It typically produces emotionally-destructive reverberations for the victim and the victim's family long after its occurrence. It can destroy the ability of a person to enjoy his or her sexuality with another.

The price of making a sexual assault victim's testimony available to courts of law historically exposed the victim to detailed questioning about his or her sexual relationships with others on the theory that a person who consented to a sexual relationship in the past was more likely to have consented in the case at hand. This tactic of "putting the victim on trial" attempts to characterize the accuser as a person who consented to the alleged unlawful sexual conduct. *See People v. McKenna*, 196 Colo. 367, 371–72, 585 P.2d 275, 277–78 (1978). Due to the likelihood or possibility that this defense will be invoked, exposing the victim's most intimate life history to public view, victims often are deterred from reporting the crime, or having reported

---

**3.** The crime formerly described as rape, from which the rape shield statute obtained its name, is now defined by statute as various forms of sexual assault.

it, from following through in the role of complaining witness. ·*Id.* at 372, 585 P.2d at 278.

At the time the Colorado General Assembly enacted the rape shield statute, many sexual assaults were never reported because victims of rape were often ashamed, humiliated, or terrified about the specter of their most private hurt being publicly revealed.[4] Therefore, the offenses could not be prosecuted under the state's criminal laws. In 1975, the FBI reported that forcible sexual assault was one of the most under-reported crimes, with the estimated actual rate of occurrence ranging from 80% to 350% more than the number reported.[5] M. Ireland, *Reform Rape Legislation: A New Standard of Sexual Responsibility*, 49 U. Colo. L.Rev. 185, 186 n. 4 (1978) (citing Fed. Bureau of Investigation, Uniform Crime Reports 22–24, 37, 42 (1975)). "Rape crisis centers tend[ed] to support ... that at least 90 percent of actual rapes [were] never reported." N. Gager & C. Schurr, *Sexual Assault: Confronting Rape in America* 91 (1976).

The FBI acknowledged in its Uniform Crime Reports that law enforcement administrators recognize that their sexual assault statistics are low because "fear and/or embarrassment on the part of victims" deter them from reporting the crime. N. Gager & C. Schurr, *supra,* at 1 (citing excerpt from a Uniform Crime Report from 1968–1973). One of the main reasons why so few sexual assaults were reported was fear of court harassment and embarrassing publicity. *Id.* at 93; National Institute of Law Enforcement and Criminal Justice, U.S. Dept. of

Justice, *Forcible Rape* 21 (March 1978) ("National Institute") ("The victim who fears that her past sexual activities may be exposed in public is less likely to report her rape and pursue prosecution."). In addition, many victims have reported that "involvement with the criminal justice system has been almost as bad as the sexual assault itself." National Institute, *supra,* at 34.

Today, the issues of underreporting are still present. The United States Department of Justice reported in 2002 that "[m]ost rapes and sexual assaults [are] not reported to the police.... Sixty-three percent of completed rapes, 65% of attempted rapes, and 74% of completed and attempted sexual assaults against females [are] not reported to the police." U.S. Department of Justice, Bureau of Justice Statistics, *Rape and Sexual Assault: Reporting to Police and Medical Attention, 1992–2000* (Aug.2002). Yet, to prosecute perpetrators of sexual assault and deter others from committing this crime, the state usually requires the victim's testimony to prove its case beyond a reasonable doubt.

Because a defendant may seek to inject irrelevant details about the victim's personal sexual conduct into the case, the Colorado General Assembly has enacted a carefully-crafted judicial mechanism that allows the prosecution and defense—in private, that is, "*in camera*"—to explore and argue about the relevancy and materiality of evidence tendered to the trial judge for admission at the public trial of the case. *McKenna,* 196 Colo. at 373, 585 P.2d at 279; *People v. Harris,* 43 P.3d 221, 226 (Colo.2002); *see* § 18–3–407, 6 C.R.S. (2003).[6]

---

**4.** In *People v. McKenna,* 196 Colo. 367, 372, 585 P.2d 275, 278 (1978), we cited the following works that support the Colorado General Assembly's legislative public policy basis for the rape shield statute: M. Ireland, *Reform Rape Legislation: A New Standard of Sexual Responsibility*, 49 U. Colo. L.Rev. 185 (1978); N. Gager & C. Schurr, *Sexual Assault: Confronting Rape in America* 145 (1976); National Institute of Law Enforcement and Criminal Justice, U.S. Dept. of Justice, *Forcible Rape* p. ix (March 1978); G. Delsohn, *Police are Baffled by Rape Increase,* Rocky Mountain News, June 18, 1978, at 5.

**5.** In an article written in 1978, the Rocky Mountain News reported that Denver, Colorado had one of the highest sexual assault rates in the nation. Delsohn, *supra,* at 5. The article also stated that "most women still are fearful of being

ridiculed and persecuted for reporting a rape." *Id.* The police and counselors stressed that "[w]omen must overcome their reluctance and report rapes...." *Id.* at 58.

**6.** Victim's and witness' prior history—evidentiary hearing. (1) Evidence of specific instances of the victim's or a witness' prior or subsequent sexual conduct, opinion evidence of the victim's or a witness' sexual conduct, and reputation evidence of the victim's or a witness' sexual conduct shall be presumed to be irrelevant except:

(a) Evidence of the victim's or witness' prior or subsequent sexual conduct with the actor;

(b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or any similar evidence of sexual intercourse offered for the purpose of

This statute deems the prior or subsequent sexual conduct of any victim to be presumptively irrelevant to the criminal trial. *See People v. Murphy,* 919 P.2d 191, 195, 197 (Colo.1996). It sets forth a detailed procedure by which a defendant may request that a court make an exception to this general rule. According to this procedure, the defendant must submit a written motion stating that the defendant "has an offer of proof of the relevancy and materiality of evidence of specific instances of the victim's ... sexual conduct." § 18–3–407(2)(a). The motion must be accompanied by an "affidavit in which the offer of proof shall be stated." § 18–3–407(2)(b).

If the court finds the offer of proof sufficient, it must hold an *in camera* hearing to determine whether the prior sexual conduct is "relevant to a material issue to the case." During the *in camera* hearing, the parties may call witnesses, including the victim. To the extent that the court deems the sexual conduct relevant to the case, this evidence will be admissible at the public trial. *McKenna,* 196 Colo. at 370–71, 585 P.2d at 276. However, the statute contemplates that contents of the *in camera* hearing and any transcripts thereof will remain confidential and under seal in the future, with the possible exception of use at the trial to impeach a witness' credibility or for some other admissible purpose.

In summary, Colorado's rape shield statute: (1) protects the sexual assault victim's privacy; (2) allows the accused person to explore facts, examine witnesses, present testimony, and challenge expert opinion to uncover material evidence potentially helpful to the defendant; (3) enables the trial judge in pre-trial proceedings to determine what shall be admitted or excluded at the public trial; (4) shelters all evidence in the *in camera* proceeding from being reported publicly; (5) keeps the evidence that is not material and relevant from being publicly reported in the future; and (6) serves the state's interest in prosecuting those accused of sexual assault and protecting the victims of sexual assault while affording defendants a fair opportunity to confront their accusers and hold prosecutors to the burden of proof at the public trial. *See People v. Murphy,* 919 P.2d at 194–95; *McKenna,* 196 Colo. at 372–73, 585 P.2d at 278–79.

## IV.

### Application to This Case

We determine that the District Court's order is a prior restraint because it

showing that the act or acts charged were or were not committed by the defendant.

(2) In any criminal prosecution under sections 18–3–402 to 18–3–405.5, 18–6–301, 18–6–302, 18–6–403, and 18–6–404, or for attempt or conspiracy to commit any crime under sections 18–3–402 to 18–3–405.5, 18–6–301, 18–6–302, 18–6–403, and 18–6–404, if evidence, that is not excepted under subsection (1) of this section, of specific instances of the victim's or a witness' prior or subsequent sexual conduct, or opinion evidence of the victim's or a witness' sexual conduct, or reputation evidence of the victim's or a witness' sexual conduct, or evidence that the victim or a witness has a history of false reporting of sexual assaults is to be offered at trial, the following procedure shall be followed:

(a) A written motion shall be made at least thirty days prior to trial, unless later for good cause shown, to the court and to the opposing parties stating that the moving party has an offer of proof of the relevancy and materiality of evidence of specific instances of the victim's or witness' prior or subsequent sexual conduct, or opinion evidence of the victim's or witness' sexual conduct, or reputation evidence of the victim's or witness' sexual conduct, or evidence that the victim or witness has a history of false reporting of sexual assaults that is proposed to be presented.

(b) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated.

(c) If the court finds that the offer of proof is sufficient, the court shall notify the other party of such and set a hearing to be held in camera prior to trial. In such hearing, the court shall allow the questioning of the victim or witness regarding the offer of proof made by the moving party and shall otherwise allow a full presentation of the offer of proof including, but not limited to, the presentation of witnesses.

(d) An in camera hearing may be held during trial if evidence first becomes available at the time of the trial or for good cause shown.

(e) At the conclusion of the hearing, if the court finds that the evidence proposed to be offered regarding the sexual conduct of the victim or witness is relevant to a material issue to the case, the court shall order that evidence may be introduced and prescribe the nature of the evidence or questions to be permitted. The moving party may then offer evidence pursuant to the order of the court.

prohibits specific entities possessing the *in camera* June 21 and June 22, 2004, transcripts from revealing the contents. *See Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993).

We also determine that, narrowly tailored, the prior restraint is constitutional. The state has an interest of the highest order in this case in providing a confidential evidentiary proceeding under the rape shield statute, because such hearings protect victims' privacy, encourage victims to report sexual assault, and further the prosecution and deterrence of sexual assault.

We further determine that a narrowly tailored order can be fashioned in this case, and it is necessary to protect against an evil that is great and certain and would result from the reportage. *CBS, Inc. v. Davis,* 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994).

### 1. The District Court's Order is a Prior Restraint on Publication of Lawfully Obtained Information

 The Recipients contend that the District Courts order forbidding publication of the information contained in the *in camera* transcripts constitutes a prior restraint. In this respect, we agree with Recipients, and they are entitled to the heavy presumption against the constitutionality of a prior restraint. An accidental leak of privileged information does not necessarily entitle a court to punish or impose a secrecy order upon the media. *See, e.g., Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219 (6th Cir.1996).

We also agree with Recipients that their acquisition of the transcripts was not illegal. Absent the prior court order, the statute, and the subsequent court order, Recipients would be free to publish the contents. *See, e.g., Bartnicki v. Vopper,* 532 U.S. 514, 528, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) (emphasizing and citing *N.Y. Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), for the proposition that a court must focus on the document's character

and the consequences of public disclosure rather than the origin of the documents).

### 2. Facts and Context of This Case

The Supreme Court's precedent requires us to base our review on the specific facts and context of this case. Here, we ground our decision on uncontested facts derived from the following parts of the record: (1) the briefs filed with us; (2) the Colorado Courts' webpage entries; and (3) the sealed *in camera* transcripts that we rely upon but do not publish in this opinion. Additionally, we take notice of matters of common knowledge in this jurisdiction.

The pre-trial proceedings in this case are constantly monitored and reported by the press. Such media-intense activity has befallen a small mountain courthouse and has prompted a sizeable commitment of Colorado judicial resources. Among these is the constant updating of the Colorado Courts' webpage to provide the press and the public with contemporaneous and archive-accessible electronic documents and scheduling dates for pre-trial and trial activities.

The electronic technology being utilized helps to facilitate for Coloradans and the world a high-degree of access to the public proceedings in this case. Yet, while most aspects of the judicial role in proceedings are highly visible and responsive to the media's First Amendment-protected right to report news to the public, the District Court closed the *in camera* rape shield hearings held on June 21 and June 22, 2004, following public announcement on June 17 and June 18 of their closure.

The District Court placed into effect reasonable procedures, in advance, to prevent the media from attending and reporting these proceedings. By a standing order entered in the case dated October 31, 2003, the District Court prohibited the parties, attorneys, and court personnel—including the court reporter—from publicly revealing the hearing contents. The District Court allowed only authorized persons, including witnesses, to attend the *in camera* hearings. To make the *in camera* evidence and arguments accessible to the court and the parties, so that the District Court could make its

rape shield statute determinations, the court reporter transcribed the *in camera* proceedings, marking every page of the *in camera* transcripts with highly visible lettering: " * * IN CAMERA PROCEEDINGS * *." The court reporter then transmitted the contents of the *in camera* proceedings mistakenly by utilizing the wrong e-mail list.

Recipients, the few media entities on whose computer screens the electronic document appeared, obtained a private transmission placed under seal by the District Court. The District Court did not intend to make these transcripts publicly available, nor did the court reporter. The private and protected nature of these transcripts was manifest to the Recipients from the bold notation on each page and the District Court's prior orders and actions.

Recipients were in a position to receive this transmission from the court reporter only because the District Court's accommodation allowed them to contract for the court reporter's electronic delivery to them of public court proceedings in the case as soon as they were available.

When the court reporter realized the transmission mistake, she notified the District Court Judge who had presided over the *in camera* proceedings. The District Court Judge then ordered the Recipients not to reveal the contents of those transcripts and to destroy them. Such order preceded any publication of the transcripts. The *in camera* transcripts continue to remain under seal. Recipients were and are amply apprised of this.

The District Court's order pertains only to the contents of these transcripts. The District Court took the only remaining action available to uphold the protections afforded by the rape shield statute, which embraces all of the state interests at stake in this case. It ordered the Recipients not to reveal the contents of the transcribed *in camera* proceedings. Were the District Court to allow publication of the mistakenly transmitted transcripts, it would abrogate all of its duties under the rape shield statute, and its own prior orders.

### 3. Prior Restraint Necessary; Harm Great and Certain

Recipients do not dispute the constitutionality of excluding the public and press from the *in camera* hearings, nor do they challenge the requirement that the parties, witnesses, and court personnel must maintain the secrecy of the proceedings.[7] Rather, the Recipients argue in this case that at the moment the transcript arrived at their computers, they lawfully acquired the information and were entitled to publish it.

In conducting our analysis of whether the prior restraint is necessary to protect against an evil that is great and certain, would result from the reportage, and cannot be mitigated by less intrusive measures, we recognize that the Supreme Court has hypothesized that a valid restraint might occur in the intersection of First Amendment and privacy rights, but has not yet decided a case approving one.

### A.

### *Florida Star* and Other Applicable Cases

We reason from Supreme Court case examples that reject the argued basis for sanctions or prior restraint.[8] These include the posited-but-rejected justifications of: removing incentives for parties to intercept private conversations, *Bartnicki v. Vopper*, 532 U.S. 514, 529, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001); minimizing the harm to persons whose conversations have been illegally intercepted, *Id.*; protecting anonymity of juvenile offenders and encouraging their rehabilitation, *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979); and protecting the reputation of state

---

7. In *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 601, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the United States Supreme Court stated that "there is an unbroken tradition of openness in criminal trials," but one major exception involves sexual assaults.

8. We recognize that many of these examples arose in cases involving after-the-fact punishment of speech rather than prior restraints. Nonetheless, they are instructive because if these reasons are not compelling enough to justify an after-the-fact restraint, they are certainly not sufficient to justify a prior restraint.

judges and maintaining the institutional integrity of the court system, *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 833, 842, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).

In many of these cases, the Court pointed to the strength of the interest asserted but held that it did not satisfy the high standard required by First Amendment law, or was not supported by empirical evidence. Nevertheless, the facts and context of this case justify the District Court's prior restraint against revealing the contents of the *in camera* transcripts.

In *Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991), the United States Supreme Court acknowledged the widespread adoption of rape shield statutes, and noted that the purpose behind them is "to protect victims of rape from being exposed at trial to harassing or irrelevant questions concerning their past sexual behavior." *Id.* at 146, 111 S.Ct. 1743. The Court held that this state interest was sufficient to warrant excluding even relevant evidence of the victim's sexual history, if the defendant failed to follow the procedures outlined in the statute. The Court reached this holding after acknowledging that precluding this evidence limited the ability of the defendant to confront witnesses. *Id.* at 149, 111 S.Ct. 1743. Nonetheless, the Court held that the state interest in protecting the victim was sufficient to justify the resulting imposition on the defendant's rights. The Court reasoned that "rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." *Id.* at 150, 111 S.Ct. 1743. In subsequent cases, the Court has been explicit in addressing the privacy interest of sexual assault victims. In *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Court stated that

"short of homicide, [rape] is the 'ultimate violation of self'." *Id.* at 597, 97 S.Ct. 2861.

Likewise, in *Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), the Supreme Court acknowledged the compelling interest of protecting a sexual assault victim's privacy.[9] In that case, a reporter obtained the name of a rape victim from a police report in a pressroom. *Id.* at 527, 109 S.Ct. 2603. The name was not supposed to be in the pressroom, *Id.* at 528, 109 S.Ct. 2603, and posted signs warned reporters not to copy or print the names of rape victims. *Id.* at 546, 109 S.Ct. 2603 (Scalia, J. dissenting). Moreover, the newspaper had a policy not to print these names. *Id.* at 528, 109 S.Ct. 2603. Nonetheless, the newspaper printed the name of the victim in a small blurb about the sexual assault in a police blotter. The victim sued, alleging that the newspaper was negligent per se in that it violated a statute making it a misdemeanor to publish the name of a sexual assault victim. *Id.* at 528–29, 109 S.Ct. 2603.

The Supreme Court addressed whether the privacy of the sexual assault victim warranted the after-the-fact restraint on publication of lawfully acquired information. *Id.* at 526, 109 S.Ct. 2603. The Court emphasized that the case involved a clash between privacy rights and First Amendment rights—both very important—and that this clash required a careful, case-by-case, fact-specific analysis. *Id.* at 530, 109 S.Ct. 2603. The Court went on to say that the interests advanced by the statute in that case—the privacy of victims, the safety of victims, and encouraging victims to report crimes—were interests of the highest public order. The Court said that "[i]t is undeniable that these are highly significant interests."[10] *Id.* at 537, 109 S.Ct. 2603.

---

9. We acknowledge that *Florida Star* involved penal sanctions for speech rather than a prior restraint. However, in *Smith v. Daily Mail*, the Court stated that "whether we view the statute as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful information is not dispositive because even the latter action requires the highest form of state interest to sustain its validity." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 101, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979). Thus, the Court's discussion necessitates the "highest form" of state interest—the identical requirement as a prior restraint.

10. The Court also discussed that, given the choice of whether to hold the state liable for inadvertently releasing the information or holding the newspaper liable for printing the information, the better choice was to hold the state liable. This is because the state should implement policies and procedures for keeping the information secret and bear the punishment for disclosing the information. To punish the newspapers would cause self-censorship, which is disfavored by the First Amendment. *Fla. Star*, 491 U.S. at 535, 109 S.Ct. 2603. Although one

■ While the Court acknowledged that the privacy interests involved were highly significant, it held that imposing damages on the newspaper for publishing the victim's name violated the First Amendment. The Court left open the possibility that "in a proper case, imposing civil sanctions for publication of the name of a rape victim might be so overwhelmingly necessary to advance these interests as to satisfy the *Daily Mail* standard." [11] *Id.*

In the case before us, the state's interest in protecting the victim's privacy is even stronger than in *Florida Star.* The Defendant Bryant is an internationally-recognized professional basketball player. The press has been covering every minute detail of this case, and most of this coverage has been published or broadcast nationwide. In addition, the reported news is typically posted on the Internet, and thus available to computer users world-wide. The *in camera* transcribed proceedings of June 21 and 22 address the prior and subsequent sexual conduct of the victim apart from her encounter with Defendant Bryant. A victim's sexual conduct is even more private than a victim's identity, which the Court held was of utmost importance in *Florida Star.*

Moreover, in contrast to *Florida Star,* the contents of the *in camera* transcribed proceedings were not publicly available, there was no burden on the press to determine whether it should risk publication and sanctions in light of the District Court's prior restraint order, and the specter of the press having to impose self-censorship was not an issue, as the transcripts were clearly marked private by the "In Camera" notation. In addition, this case is distinguishable from *Near, Landmark,* and *New York Times* because the contents of these transcripts do not implicate suppression of public policy debate

or criticism of public officials. To the contrary, the testimony concerns conduct that is intensely private and personal.

In *Florida Star,* as the Supreme Court explored the tension between First Amendment rights and statutory rights to privacy, the Court noted that First Amendment rights are not absolute. Under the proper circumstances, the scale may tip in favor of the state's interest that protects the victim's privacy. *Fla. Star,* 491 U.S. at 530, 532–33, 109 S.Ct. 2603. For the reasons discussed in this opinion, we hold that this is just such a case. In his dissent in *Florida Star, id.* at 542, 109 S.Ct. 2603, Justice White emphasized the severity of sexual assault as compared to other crimes, as well as the fact that the ensuing publicity often multiplies the harm to the victim. He explained that even when the government attempts to protect the victim, "mistakes happen" and sometimes rape victims' personal information is inadvertently disclosed. *Id.* at 542, 547, 109 S.Ct. 2603.

As Justice White observed: "The Court's concern for a free press is appropriate, but such concerns should be balanced against rival interests in a civilized and humane society. An absolutist view of the former leads to insensitivity as to the latter." *Id.* at 547 n. 2, 109 S.Ct. 2603. Here, where the mistake was caught before the *in camera* information was further disseminated, the balance must tip in favor of keeping the information private.

## B.

### Our Determinations Regarding the Harms in this Case

Under the circumstances and context of this case, any details of the victim's sexual conduct reported from the *in camera* tran-

might note the similarity to the facts in the present case, in that in both cases the government inadvertently disclosed the information, the reasoning in *Florida Star* does not require us to invalidate the prior restraint simply because government error caused the problem. The fact that this information has not yet become public and is still sensitive and private leads to the conclusion that constitutionally permissible measures may be taken to maintain the secrecy of the transcribed *in camera* information.

11. *This standard is that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." Daily Mail,* 443 U.S. at 103, 99 S.Ct. 2667.

scripts will be instantaneously available world-wide and will irretrievably affect the victim and her reputation. She is entitled to rely on the protective provisions of the rape shield statute, which the state affords her in her capacity as complaining witness in a sexual assault prosecution. This includes the District Court's prohibition against the further release of the contents of the transcribed *in camera* proceedings.

Recipients have presented to us an affidavit attaching many press articles containing information about the victim's purported sexual activity before and after her encounter with Defendant Bryant. In addition, the probable cause order made public in this case contains hearsay references to DNA testing, the victim's clothing, and evidence that the victim had engaged in sexual activity with other persons. The argument is that the victim's privacy is already hugely compromised and publication of the *in camera* proceedings will not result in graver infringement on the victim's privacy.

We have reviewed the transcripts of these hearings and disagree. The applicable United States Supreme Court standard of review does not require us to disclose what is in the *in camera* proceedings versus what is already in the public domain. Doing this would contravene the rape shield statute by revealing what is in the transcripts and destroying the confidentiality of that information, before the trial court determines whether the information is relevant and material.

Rather, the applicable standard of review requires us to determine whether publication of these transcripts would cause great and certain harm to a state interest of the highest order. We conclude that it would.

First, the evidence and the opinion testimony presented at these *in camera* proceedings were taken under oath in a court of law. Reporting these court proceedings will add a level of official legitimacy and detail to the information that does not attend press reports—the ring of authenticity, the stamp of

authority. Because sworn testimony is viewed by the law and the public as having greater value and credibility than press reports of unsworn statements, this will cause great and certain harm to the victim's privacy interest. Unsworn statements often contain a mix of fact, conjecture, rumor, and unconfirmed assertions that a person might not make under oath, or that lack evidentiary value or relevance.

We do not accept the proposition that the greater the press attention to a case the less important it becomes to keep *in camera* rape shield transcripts from being published. If the contents of these transcripts are reported, the world will have access to graphic detail of sworn evidence and opinion testimony about the victim's sexual conduct that the public trial of the case may not reveal, because the District Court may determine it to be irrelevant and immaterial under the rape shield statute. The very damage that the rape shield statute is designed to prevent—confirming through *in camera* court proceedings the details of this victim's sexual conduct that are not relevant or material—would thereby occur.[12]

Second, the state's interests of the highest order in this case not only involve the victim's privacy interest, but also the reporting and prosecution of this and other sexual assault cases. Revealing the *in camera* rape shield evidence will not only destroy the utility of this very important legal mechanism in this case, but will demonstrate to other sexual assault victims that they cannot rely on the rape shield statute to prevent public airing of sexual conduct testimony the law deems inadmissible. This would directly undercut the reporting and prosecution of sexual assault cases, in contravention of the General Assembly's legislative purposes.

Third, it is absolutely essential to our analysis that these transcripts are still private. Reportage of their contents would make all matters contained therein public. The court reporter's mistake handed to only a few me-

---

12. We also note that the victim's physical safety has apparently been jeopardized by the publicity in this case. In a pleading filed with the District Court on July 12, 2004, the victim's counsel stated that he had "met with the Los Angeles Federal Bureau of Investigations and Los Angeles County Sheriff's Office regarding what those agencies considered to be a credible [threat of a] plan to kill the victim in the Bryant case for financial gain."

dia entities contains material that was plainly marked and intended to be kept private. The very purpose of such a marking is to make authorized readers aware that the information contained therein is restricted to use only in and for the proceedings in which the evidence and argument thereon was taken. In this case, the confidentiality markings served to notify the non-authorized readers, Recipients, that this document remained under seal. Reportage of these transcripts would greatly and certainly magnify the harm of the mistaken transmission, to the immediate detriment of the victim and the state.

Taken together, the harms in making these *in camera* judicial proceedings public would be great, certain, and devastating to the victim and to the state. These harms justify the remedy we fashion in this case. "For even though the broad sweep of the First Amendment seems to prohibit all restraints on free expression, this Court has observed that freedom of speech ... does not comprehend the right to speak on any subject at any time." *Seattle Times, Co. v. Rhinehart*, 467 U.S. 20, 31, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (citations and quotations omitted).

If the District Court cannot prevent the release of the contents of the *in camera* transcripts while it expeditiously proceeds to make its relevancy and materiality determinations, as contemplated in the rape shield statute, the state will be unable to implement its interest of the highest order in providing a confidential evidentiary proceeding under the rape shield statute, because such hearings protect victims' privacy, encourage victims to report sexual assault, and further the prosecution and deterrence of sexual assault.

Accordingly, upon reviewing *de novo* the record in this case, including the *in camera* transcripts, we determine that indeed the District Court's order is a prior restraint against publication, which is presumptively unconstitutional under the First Amendment. However, given the circumstances of this case, the state's interest in keeping the *in camera* proceedings confidential is sufficiently weighty to overcome the presumption in favor of dissemination at this time. We also determine that this prior restraint is necessary to protect against an evil that is great and certain and would result from the reportage.

Specifically: (1) the transcribed *in camera* proceedings concern the relevancy and materiality of evidence of specific instances of the victim's sexual conduct prior to and after the alleged sexual assault, and opinion evidence related thereto; (2) the state of Colorado has not made these transcribed proceedings publicly available; (3) the District Court has not yet determined whether all or any portion of the matters reported therein consist of relevant and material evidence potentially admissible at trial in this case; (4) the Colorado rape shield statute presumptively declares inadmissible all evidence of a victim's prior or subsequent sexual conduct and related opinion evidence, unless the defendant proves at an *in camera* hearing that such evidence is relevant and material; (5) the transcripts of *in camera* rape shield hearings do not become public unless and until they are introduced at trial; (6) reporting publicly the contents of the *in camera* transcripts would cause great and certain harm to the state's interest in providing the rape shield hearing in this case, including the victim's privacy and safety interest, encouraging victims to report sexual assault, and prosecuting and deterring sexual assault; and (7) the District Court's order, properly narrowed, is the only means available to protect this interest.

### 4. Narrowing the District Court's Order and Our Judgment

We have a duty under First Amendment law to narrow the District Court's order as much as possible.

In *Seattle Times*, a media entity was a party to the case and was prohibited by court order, as were all other parties, from publishing information it had gathered through use of discovery rules; the Supreme Court held that this form of restraint was not "the kind of classic prior restraint that requires exacting First Amendment scrutiny" and was not unconstitutional. *Seattle Times*, 467 U.S. at 33, 104 S.Ct. 2199.

Although Recipients are not parties to this case, *Seattle Times* is somewhat analogous.

Recipients have obtained transcripts that the state in no way intended to make public, and they received these transcripts under a confidentiality notice. Moreover, analogous to the pre-trial proceedings in *Seattle Times,* rape shield hearings are not "public components" of a trial. *Id.*

The facts of this case do not involve placing the transcripts in a "media bin" analogous to a publicly available police bulletin board or broadcast that could be publicly monitored. Recipients have no stake in the transcripts as a result of their investigative efforts. Due to the state's mistake, the transcripts appeared on their computer.

Yet, the state cannot undo the transmission; it has occurred. Ordinarily, the transcripts of an *in camera* rape shield hearing would remain under seal at all times, with the possible exception of actual use at trial to impeach a witness or for some other limited purpose. Here, although released by mistake and Recipients were not entitled to have them, Recipients do have possession of these transcripts.

The District Court ordered Recipients to delete the electronic transmission they received and destroy any copies made of them. We strike that portion of the District Court's order that required Recipients to delete the electronic transmission and destroy any and all copies of the *in camera* transcripts. We determine under the facts and context of this case that we must narrow the District Court's order and fashion a remedy that otherwise would not be applicable to a transcript of an *in camera* rape shield hearing. The government's interest of the highest order will be served by preventing the further dissemination and any reporting of all or any portion of the contents of the *in camera* transcripts that are not relevant and material under the rape shield statute.

Consistent with the First Amendment and the state's interest of the highest order, we order the District Court to: (1) make its rape shield rulings as expeditiously as possible and promptly enter its findings of facts and conclusions of law thereon; (2) determine if some or all portions of the June 21 and June 22 transcripts are relevant and material and, therefore, admissible under the rape shield statute at trial; and (3) enter an appropriate order, which may include releasing to the Recipients and the public a redacted version of the June 21 and June 22 transcripts that contains those portions that are relevant and material in the case, if any, and maintains the ongoing confidentiality of portions that are irrelevant and immaterial, if any.

Finally, although we believe the District Court's order is also sufficiently clear and narrow on this point, we emphasize that our judgment applies only to the contents of the June 21 and June 22 *in camera* transcripts. Publication of information the media has obtained or obtains by its own investigative capacities is not limited by the District Court's order or our judgment, even though such information may also be spoken of or referred to in the transcripts.

## V.

### Order and Judgment

Accordingly, we uphold the prohibition against revealing the contents of the transcribed *in camera* proceedings of June 21 and 22, 2004, and affirm the District Court's order to that extent. We strike that portion of the District Court's order that requires Recipients to delete the electronic transmission and destroy any and all copies of the *in camera* transcripts. We further order the District Court to make its relevancy and materiality determinations under the rape shield statute as expeditiously as reasonably possible regarding the evidence it heard in the rape shield *in camera* proceedings, and promptly enter its findings of facts and conclusions of law thereon. In connection therewith, the District Court shall address whether any or all of the transcribed *in camera* proceedings of June 21 and 22 shall be made public or shall remain private, and enter appropriate orders.

Therefore, we uphold the prohibition against revealing the contents of the transcribed *in camera* proceedings of June 21 and 22, 2004, and discharge our rule to show cause, in part. We make our rule to show cause absolute, in part, by striking the provision for immediate deletion and destruction of the transcripts. We remand this case to

the District Court for further proceedings consistent with this opinion.

Justice BENDER dissents, and Justice MARTINEZ and Justice RICE join in the dissent.

Justice BENDER, dissenting.

## I.

The question in this case is whether a court may prohibit publication of all or part of a transcript of an *in camera* rape shield hearing where the transcript was inadvertently released to the media by trial court personnel. In my view, two striking facts about this case make it obvious that the prior restraint issued by the district court is an unconstitutional violation of the freedom of the press guaranteed by the First Amendment. First, most of the private details of the alleged victim's sexual conduct around the time of the alleged rape, which is also the subject matter of the confidential hearings in this case, are already available through public court documents and other sources and have been widely reported by the media. Second, the media did nothing wrong in obtaining the transcripts. Under well-established prior restraint doctrine, these two factors alone require this Court to direct the district court to vacate its order immediately.

The majority holds that the interests protected by the rape shield statute are compelling enough to overcome the heavy presumption against the constitutionality of a prior restraint. To reach this holding, the majority overemphasizes the importance of the state interest at stake here and virtually ignores the First Amendment guarantee that in all but the most extreme circumstances the media must be free to decide what it may or may not publish.

In a case such as this, where truthful information of public importance is lawfully obtained by the media, a prior restraint may only be issued where publication will inevitably, directly, and immediately harm a state interest of the highest order. This does not mean that if the interest the state asserts is compelling in the abstract the government may issue a prior restraint to protect it.

Rather, the government must prove that in the particular circumstances of a given case, the threat to a government interest is so great, so grave, and so certain that it cannot be protected by any means other than a prior restraint. If publication of the information in question does not pose an immediate threat, a prior restraint amounts to nothing more than government censorship.

Because the district court did not make any specific findings indicating what harm it sought to prevent by issuing the order, I can only assume, as does the majority, that the court meant to protect the interests implicated by the rape shield statute. Even making the debatable assumption that these interests are state interests of the highest order, and that a threat to these interests could in the appropriate circumstances warrant abridging the freedom of the press, in this case the order cannot protect the alleged victim from the harm the district court sought to prevent. The media, both mainstream and electronic, has widely disseminated intimate, personal, and inflammatory information about the alleged victim. For example, based on information obtained from several public court filings, the media have reported: the details of the alleged victim's sexual activity during the few days surrounding the alleged rape; the contents of the defendant's pleadings, which contain his factual theories regarding why this evidence is relevant to his consent defense and therefore why it should be admitted at trial; and the prosecution's counter-arguments about why this evidence is not probative. Much of the information presented at the rape shield hearing, and most of the legal theories argued at the hearing, are already available to the public and have been reported in the mainstream and electronic media. Given this particular set of circumstances, the interests served by the rape shield statute cannot be protected by the lower court's order.

The only objective that could be accomplished by the district court's order is to protect the confidentiality of this *in camera* hearing. That duty was our responsibility, which we unfortunately failed to carry out. Having failed, we, the judiciary—the government—cannot now order the media to per-

form the role that we were obligated, but failed, to do—to protect the privacy interests of the alleged victim. Nonetheless, the majority approves the court's power to prevent the dissemination of speech which the court deems dangerous or offensive. In doing so, the majority authorizes the court, rather than the media, to determine what can or cannot be published concerning truthful information regarding a matter of public importance.[1] The power the majority authorizes is the power of the government to censor the media, which is precisely the power the First Amendment forbids. The appropriate standard for deciding the validity of the prior restraint in this case was best articulated by Justice Potter Stewart who said: "Though government may deny access to information and punish its theft, government may not prohibit or punish the publication of that information once it falls into the hands of the press, unless the need for secrecy is manifestly overwhelming." *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 849, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (Stewart, J., concurring). That need is not present here.

For all of these reasons, I respectfully dissent.

## II.

The majority employs a wide range of legal authority, some of which is relevant to prior restraint law and some of which is not, to analyze the district court's order. In doing so, the majority fails to come to grips with the fundamental theme of the First Amendment's prohibition against prior restraints: no matter how compelling, lofty, or noble the state interest, a prior restraint may not be issued to protect it unless there can be

absolutely no doubt that great, grave, and certain harm will be done to that interest as a result of publication. The right of the press to publish truthful, lawfully obtained information may not be abridged for speculative harms; nor may a reviewing court's approval of a prior restraint be based on conclusory determinations that harm might ensue from publication. *See N.Y. Times v. United States,* 403 U.S. 713, 725–26, 91 S.Ct. 2140, 29 L.Ed.2d 822 (Brennan, J. concurring); *United States v. Noriega,* 917 F.2d 1543, 1549 (11th Cir.1990).

Because prior restraints are so strongly disfavored, the United States Supreme Court has avoided developing a rigid test to evaluate their propriety. Instead, prior restraint doctrine requires exacting, case-by-case review to determine whether a state interest of the highest order will undoubtedly suffer great, grave, and certain harm as a result of publication. *See, e.g., Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 102, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979); *N.Y. Times,* 403 U.S. at 726–27, 91 S.Ct. 2140 (Brennan, J., dissenting); *Neb. Press Assn. v. Stuart,* 427 U.S. 539, 562–65, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Under this standard, the Supreme Court has never found a threat to a state interest of the highest order sufficient, in and of itself, to justify a prior restraint.[2]

For example, in *Nebraska Press,* extensive pre-trial publicity about a murder in a small town threatened the defendant's Sixth Amendment right to be tried before an impartial jury, a right the Court characterized as "fundamental to the American scheme of justice." 427 U.S. at 553, 96 S.Ct. 2791. The Court did not, however, conclude its analysis by holding that the abstract threat posed to that right justified a prior restraint. In-

---

1. It is beyond dispute that these transcripts concern matters of public importance. As the Supreme Court put it in *Richmond Newspapers, Inc. v. Virginia,* "[I]t would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." 448 U.S. 555, 575, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

2. The Supreme Court of South Carolina, however, has held that a prior restraint forbidding publication of truthful, lawfully obtained facts is warranted where publication will do harm to the

both the defendant's right to a fair trial and the attorney-client privilege. *See State–Record Co. v. State,* 332 S.C. 346, 504 S.E.2d 592 (1998), *cert. denied,* 526 U.S. 1050, 119 S.Ct. 1355, 143 L.Ed.2d 517 (1999). In that case, the media wanted to disseminate a surreptitiously recorded videotape containing a privileged communication between the defendant in a death penalty case and his attorney. The court held that the threat to the defendant's Sixth Amendment right in that case was sufficiently certain and grave to warrant the prior restraint. *Id.* at 353–55, 504 S.E.2d 592.

stead, the Court held the prior restraint invalid because the lower court failed to show that the pre-trial coverage of the murder made it impossible to impanel an impartial jury. *Id.* at 569, 96 S.Ct. 2791.

In *In re Charlotte Observer,* the interest in the secrecy of grand jury proceedings, which has long been considered a governmental interest of the highest order, along with an attorney's reputational and privacy interests, were jeopardized when the name of the attorney who was a target of the investigation was inadvertently revealed in open court by a federal judge. 921 F.2d 47, 50 (4th Cir.1990) (citing Fed.R.Crim.P. 6(e)(3)(C) and *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). Nevertheless, the Fourth Circuit did not hold that a violation of the government's interest in the secrecy of grand jury proceedings or of the attorney's reputational interests, in the abstract, justified a prior restraint. Nor did the court find that the harm to the attorney's reputation would be magnified by the fact that an Article III judge, in the course of an official court proceeding, revealed that the attorney was under investigation. Rather, the court held that once the name had been revealed in open court, the government's interest in preserving the secrecy of the grand jury proceedings was lost. *Id.* at 50; *cf. Fla. Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (risk of harm to rape victim's right to privacy not sufficient to support civil damages award against media where information was lawfully obtained); *Daily Mail,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (threat to privacy interests of juvenile offenders did not warrant punishing newspapers that published offenders' names in violation of a state statute where names were lawfully obtained); *Landmark,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (risk of injury to judge, system of justice, and operation of judicial inquiry commission not sufficient to warrant sanctioning the media for publishing truthful, lawfully obtained information); *Okla. Publishing Co. v. District Court,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) (state statute prohibiting publication of names and photographs of juvenile offenders could not be upheld by a prior restraint where such information had already been widely disseminated).

I now turn to the rape shield statute and the state interests it advances and examine whether the prior restraint issued by the district court can in fact protect these interests.

## III.

Colorado's rape shield statute, § 18–3–407, 6 C.R.S. (2003), protects the privacy of a victim of sexual assault by ensuring that intimate details of his or her sexual history are not revealed in a public trial unless a court determines that this evidence is relevant to a material issue in the case. The statute also protects a defendant's right to a fair trial by allowing a defendant to introduce such evidence in the appropriate circumstances. The *in camera* proceeding created by the rape shield statute concerns admissibility of evidence, in particular whether the evidence the accused seeks to admit is relevant and material to the issues in the trial.

This statute was enacted to provide victims of sexual assault "greater protection from humiliating and embarrassing public 'fishing expeditions' into their past sexual conduct, without a preliminary showing that evidence thus elicited will be relevant to some issue in the pending case." *People v. McKenna,* 196 Colo. 367, 371–72, 585 P.2d 275, 278 (1978). The General Assembly believed that providing such protection would encourage victims to report sexual assault by ensuring that they would "not be subjected to psychological or emotional abuse in court as the price of their cooperation in prosecuting sex offenders." *Id.*

Of course, as an abstract matter, protecting victims of sexual assault from the embarrassing ordeal of unnecessarily exposing the details of their sexual history in open court is an important government interest, as is encouraging victims of sexual assault to report the crime. However, the abstract importance of these interests cannot, on their own, justify the prior restraint issued in this case. Rather, this Court must determine whether, under the circumstances of this case, the

district court's order will protect the alleged victim from precisely these harms.

The majority's analysis, however, overemphasizes the abstract importance of the purposes served by the rape shield statute and minimizes the impact that the information already available to the public about this alleged victim's past sexual conduct has on the alleged victim's privacy interests, at least insofar as they are protected by the rape shield statute.

I read the majority's opinion to assume that the public has access to a vast amount of information about the alleged victim's private sexual history. The majority characterizes this information as a mixture of "fact, conjecture, rumor, and unconfirmed assertions that a person might not make under oath." Maj. Op. at 636. What the majority finds troubling is that many of these same details will be reported in the form of sworn testimony if the confidential transcripts are released to the media. By focusing on the form of the information rather than the content, the majority presumes that grave harm and "injustice" will be done to the alleged victim, which has not already been done by the extensive reporting of the underlying sexual assault case.

I disagree. This conclusion is at odds with standard prior restraint doctrine. The harm that could have been prevented by the prior restraint has already occurred, and, because this harm has occurred, the heavy presumption against the constitutionality of a prior restraint has not been overcome.

Prior restraint law is not concerned with how information will be received. Rather, it is concerned with whether an order preventing publication of truthful, lawfully obtained information will in fact prevent harm from occurring in the first place. The only harms that the prior restraint could prevent in this case are protecting the alleged victim from humiliation as a result of unnecessary disclosure of her private sexual history and encouraging future victims to report sexual assaults. *See McKenna*, 196 Colo. at 371–72, 585 P.2d at 278.

Turning to the information available to the public, it seems undeniable to me that the damage to the alleged victim's privacy interests has already been done in this case. The majority, through its sanction of the order not to publish, seeks to protect the alleged victim from embarrassing revelations about her private sexual conduct, but "that cat is out of the bag." *See Charlotte Observer*, 921 F.2d at 50. Through court filings and interviews with the alleged victim's associates, the media have reported on topics related to the evidence considered at the rape shield hearing and the purposes for which the defense seeks to admit that evidence. In an article concerning the media's attempts to publish the transcripts at issue here, the *Denver Post* reported:

> The transcripts are from a hearing June 21–22. Portions that were closed dealt primarily with arguments about the accuser's sexual activity in the days surrounding her encounter with Bryant last summer, and money given her by a state victims' compensation program.
>
> Bryant's attorneys claim she had multiple sexual partners in the days surrounding the encounter and have suggested her injuries could have been caused during sex with someone other than Bryant.
>
> They also say she received unusually large amounts of money from the compensation program, suggesting it was an incentive to go forward with the case.

Jon Sarche, *Media Seek Court OK for Publication of Bryant Transcripts*, Denver Post, July 7, 2004.

The county court's order finding probable cause to proceed with the prosecution, which is available to the public, indicates that DNA samples taken from the alleged victim's body and from the underwear she wore to the sexual assault examination contained semen that did not match the defendant's DNA profile, and that pubic hair obtained during the examination did not match that of the defendant. Other publicly available pleadings describe the defense's factual theories about how the DNA evidence advances the defendant's consent defense and why it should be admitted at trial. Both television and internet media have reported in detail the prosecution's theory of how DNA evidence from a person other than the defen-

dant was found on the alleged victim's body. *See, e.g., Could Evidence be Lethal to Prosecution Case?* at http://celebrityjustice.warnerbros.com/news/0403/02a.html.

In addition to the mainstream media, several websites have been devoted to following the underlying sexual assault case, and many of these provide highly personal and potentially harmful details about not only the alleged victim's sexual history but also her medical and mental health history. These websites are easily accessible to any computer user with minimal research skills.

Privacy interests fade once they are a matter of public record. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 494–95, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Therefore, from my perspective, I reluctantly conclude that the facts available to the public have irretrievably compromised this alleged victim's privacy interests, at least insofar as they can be protected by the rape shield statute. So much is known about the victim's sexual history and the nature of the evidence presented at the confidential rape shield hearing that preventing dissemination of the transcript cannot protect the victim from public exposure of "humiliating and embarrassing" details of her sexual history. Along these same lines, the state cannot salvage its interest in encouraging future victims to report sexual assaults by restraining publication of the transcripts in this case. Because this case has generated such intense media scrutiny, which in turn has lead to the release of voluminous details about the alleged victim's private sexual, medical, and mental health history, the damage done to this state interest is irreversible.

I sympathize with the majority's desire to offer some assurance that the alleged victim will not be subject to further unnecessary harm from invasive and even at times mean-spirited revelations about her private life. But as a court, our sole task is to determine whether this case presents one of those extraordinary circumstances where the harm to a state interest is so great and so sure to occur that the freedom of the media to publish what it sees fit, free from government interference, may be abridged. Prior restraints are not meant to mitigate harms that

have already occurred. They are meant to be issued only to prevent great, grave, and certain harm.

Because the prior restraint issued in this case can accomplish nothing more than preventing, at best, incremental harm to the interests protected by the rape shield statute, I conclude that the district court has not overcome the heavy presumption against the constitutionality of prior restraints. The facts of this case are not so extraordinary that we as a court can overlook the fundamental importance of the media's right to decide for itself what it may or may not publish.

The Supreme Court has repeatedly recognized that the media, not the government, must decide whether lawfully obtained information should be released to the public: "If the constitutional protection of a free press means anything, it means that government cannot take it upon itself to decide what a newspaper may and may not publish." *Landmark,* 435 U.S. at 849, 98 S.Ct. 1535 (Stewart, J., concurring). "Once the government has placed [confidential] information in the public domain, 'reliance must rest upon the judgment of those who decide what to publish or broadcast.'" *Fla. Star,* 491 U.S. at 538, 109 S.Ct. 2603 (quoting *Cox Broadcasting,* 420 U.S. at 496, 95 S.Ct. 1029 (1975)). "Both the history and language of the First Amendment support the view that the press must be left free to publish news, whatever the source, without censorship, injunctions, or prior restraints." *N.Y. Times,* 403 U.S. at 717, 91 S.Ct. 2140 (Black, J., concurring).

I do not disagree with the majority's contention that the alleged victim in this case "is entitled to rely on the protective provisions of the rape shield statute, which the state affords her … in a sexual assault prosecution." Maj. Op. at 636. I do, however, disagree with the proposition that once the confidentiality of the rape shield statute has been breached to the extent that it has in this case, the state may require the media to do what the state failed to—give the alleged victim the protections afforded by the statute. It is the responsibility of the government, not the media, to protect information

that lies within its control. *See Fla. Star,* 491 U.S. at 534–35, 109 S.Ct. 2603. When the government loses control of confidential information in its possession, either through deliberate leaks or inadvertent error, the government may not require the media to take over the state's responsibility except in highly unusual circumstances which are not present here.

At this point, we, in our capacity as representatives of the government, have lost our ability to determine whether it best serves the public to maintain the confidentiality of the transcripts of the *in camera,* rape shield hearing. Rather, that determination must now be made by the media. Any attempt on our part to restrain the media from publishing that information constitutes government censorship prohibited by the First Amendment.

I am authorized to state that JUSTICE MARTINEZ and JUSTICE RICE join in this dissent.